966 A.2d 900

Joan L. FLOYD

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE, et al.**

No. 56, Sept. Term 2008.

Court of Appeals of Maryland.

Feb. 19, 2009.

Reconsideration Denied April 6, 2009.

462

J. Carroll Holzer (Holzer & Lee of Towson), on brief, for petitioners/cross-respondents.

William R. Phelan, Jr., Chief Solicitor (George Nilson, City Solicitor, Baltimore City Department of Law of Baltimore), John A. McCauley (Venable LLP of Baltimore), on brief, for respondents/cross petitioners.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, and JOHN C. ELDRIDGE, (Retired, Specially Assigned), and ALAN M. WILNER, (Retired, Specially Assigned), JJ.

BATTAGLIA, J.

Owners of property in the Charles Village area of Baltimore City are subject to a Supplemental Tax in addition to the property tax that the City imposes on all property owners, although it is not imposed on property that is otherwise exempt under Section 6–8(a)(2) of Article XIV of the Baltimore City Code or by any act of the General Assembly, such as property used for charitable, educational or religious purposes. Sections 7–202 and 7–204 of the Tax–Property Article, Maryland Code (1985, 2001 Repl.Vol., 2005 Supp.).

█ In the present case, Joan Floyd and other individuals [1] subject to the Supplemental Tax alleged in a complaint filed in the Circuit Court for Baltimore City that the 2007 tax could not properly be imposed, because the Charles Village Community Benefits District Management Authority Board did not have the requisite quorum,[2] on April 11, 2006, when the 2007 Supplemental Tax rate was approved for submission to the Board of Estimates.[3] The challengers contended that three of the ten Board members present at the April 11, 2006 meeting were ineligible to vote. They also asserted that the common law quorum requirement pertaining to governing bodies was applicable, so that ten voting members, a majority of the nineteen authorized voting members, were required to be present at the April 11, 2006 meeting to constitute a quorum. The defendants, the Mayor and City Council of Baltimore as well as the Charles Village Community Benefits District Management Authority, conversely, disputed that any of the Board members present at the meeting were ineligible to vote and argued that the Corporations and Associations Article of the Maryland Code (1975, 1999 Repl.Vol., 2005 Supp.),[4] applied so that a quorum of only nine voting members was required.

1. Although this case began with various complainants, Floyd is the sole Petitioner. *See infra* note 6 and accompanying text.

2. A quorum is defined as "that number of the body which, when assembled in their proper place, will enable them to transact their proper business; or, in other words, that number that makes the lawful body, and gives them the power to pass a law or ordinance." *Heiskell v. City Council of Baltimore*, 65 Md. 125, 149, 4 A. 116, 119 (1886). *See also* Black's Law Dictionary 1284 (8th ed.2004) (defining "quorum" as "[t]he minimum number of members (usually a majority of all the members) who must be present for a deliberative assembly to legally transact business").

3. The Board of Estimates, which is "composed of the Mayor, President of the City Council, Comptroller, City Solicitor, and Director of Public Works," is responsible for "formulat[ing] and execut[ing] the fiscal policy of the City to the extent, and in the manner provided for, in the Charter." Sections 1 and 2 of Article 6 of the Baltimore City Charter.

4. Statutory references to the Corporations and Associations Article throughout are to the Maryland Code (1975, 1999 Repl.Vol., 2005 Supp.), unless otherwise noted.

The trial court entered judgment in favor of defendants and the Court of Special Appeals, in a reported opinion, affirmed. *Floyd v. Mayor and City Council of Baltimore,* 179 Md.App. 394, 946 A.2d 15 (2008). We granted certiorari, *Floyd v. Baltimore,* 405 Md. 348, 952 A.2d 224 (2008), to answer the following questions presented in the petition and cross-petition:

1. Did the Court of Special Appeals err in ruling that a special taxing district—created by a special act of the General Assembly—may conduct its business in accordance with certain provisions of the Corporations and Associations Article instead of the more strict common law quorum requirements of a governmental entity?

2. Did the Court of Special Appeals err in ruling that, while the enabling legislation requires a voting member of the Charles Village Community Benefits District Board of Directors to be an owner of taxable property or registered voter in the District, a voting seat may be held by an individual who is *neither* a registered voter *nor* an owner of property in the District, but is the 'president and owner' of a corporation that owns taxable property?

3. Did the Court of Special Appeals err in ruling that where the Supplemental Tax rate must have the approval of a "majority of all of the voting Board members," this requirement applies only to the *sitting members* instead of the full authorized membership, and that approval by the "majority" is not required annually, but only when the Supplemental Tax rate is changed? [5]

4. Did the Court of Special Appeals err in when it:

   a. "dismissed" the appeals of two *non-Appellants?*

   b. assessed all costs of the City of Baltimore's unsuccessful Cross–Appeal against the Appellants? [6]

---

**5.** Because we shall hold that the Supplemental Tax was properly approved by the Board, we need not address whether the rate must be approved annually.

**6.** Question 4 was neither briefed nor the subject of argument. As a result, we will not address it.

5. Did the trial court err by entering a declaratory judgment in the absence of a justiciable controversy, when the District Board cured any possible defects in its proceedings by the subsequent ratification of its challenged actions? [7]

## I. Introduction

In 1994, the General Assembly enacted legislation enabling the Mayor and City Council of Baltimore to "establish, by ordinance, not more than six community benefits district management authorities, including the Charles Village Community Benefits District," [8] which would "promote and market

---

7. Because of our holding, we need not and do not address this issue.

8. The General Assembly acted pursuant to Section 2 of Article XI–A of the Maryland Constitution, which states that the General Assembly may "provide a grant of express powers" for charter home rule jurisdictions. Unlike home rule counties, however, the express powers of which are codified in Section 5–6 of Article 25A of the Maryland Code (1974, 2005 Repl.Vol.), the express powers of Baltimore City are codified in Article II of the Baltimore City Charter. *Piscatelli v. Bd. of Liquor License Comm'rs*, 378 Md. 623, 837 A.2d 931, 937–38 (2003). A thorough description of charter home rule jurisdictions under Article XI–A of the Maryland Constitution and the express powers granted to those jurisdiction by the General Assembly was provided by Judge John C. Eldridge, writing for this Court, in *Piscatelli*, 378 Md. at 633–34, 837 A.2d at 937–38:

   Baltimore City is a charter home rule jurisdiction under Article XI–A of the Maryland Constitution. As we have pointed out on numerous occasions, Article XI–A enabled Baltimore City and counties " 'which chose to adopt a home rule charter, to achieve a significant degree of political self-determination.' " *Holiday Universal v. Montgomery County*, 377 Md. 305, 313, 833 A.2d 518, 523 (2003), quoting *Tyma v. Montgomery County*, 369 Md. 497, 504, 801 A.2d 148, 152 (2002). Article XI–A's "purpose was to transfer the General Assembly's power to enact many types of . . . public local laws to the Art. XI–A home rule" jurisdictions, *McCrory Corp. v. Fowler*, 319 Md. 12, 16, 570 A.2d 834, 835–836 (1990).

   Article XI–A, § 2, of the Constitution requires the General Assembly to enact a grant of express powers for Baltimore City and the counties which have adopted home rule charters. The provision states:

   "The General Assembly shall by public general law provide a grant of express powers for such County or Counties as may thereafter form a charter under the provisions of this Article. Such express powers granted to the Counties and the powers heretofore granted to the City of Baltimore, *as set forth in Article 4, Section 6, Public Local Laws of*

districts, provide supplemental security and maintenance services, provide amenities in public areas, provide park and recreational programs and functions, and after an authority is established, other services and functions as requested by the authority and approved through an ordinance." Chapter 732 of the Maryland Laws of 1994.[9] The Legislature granted the Charles Village Community Benefits District Authority (the "Authority") the power, as provided by ordinance, to "be a special tax district," to submit to the Board of Estimates annually the proposed taxes to be imposed on properties in the district, to adopt bylaws, "to establish and elect officers and provide for their terms and duties" and "to do all things necessary or convenient to carry out its powers." *Id.* It also empowered the Mayor and City Council to provide, in the establishing ordinance, for the imposition of taxes, subject to the Board of Estimates' approval, and for the "organization and method of initial appointment of officers and board members of the Authority," with the limitation that voting board members "be eligible to vote in the election under subsection [ (k)] of this section."[10]  *Id.*

———

Maryland [now codified as Article II of the Baltimore City Charter] shall not be enlarged or extended by any charter formed under the provisions of this Article, but such powers may be extended, modified, amended or repealed by the General Assembly."

Most of the express powers granted by the General Assembly pursuant to Article XI–A, § 2, are contained in Maryland Code (1957, 2001 Repl.Vol.), Article 25A for home rule counties, and in Article II of the Baltimore City Charter for the City of Baltimore.

**9.**  Chapter 732 of the Maryland Laws of 1994 was originally codified as Section 62 of Article II of the Baltimore City Charter and is now codified as Section 63 of Article II of the Baltimore City Charter. Amendments to the originally enacted legislation, which are not relevant to our analysis, were made by Chapter 3 of the Maryland Laws of 1995, Chapter 10 of the Maryland Laws of 1996, Chapter 655 of the Maryland Laws of 1997, Chapter 89 of the Maryland Acts of 2000 and Chapter 475 of the Acts of 2003.

**10.**  Section 63(k) of Article II of the Baltimore City Charter provides:

(1) An ordinance adopted pursuant to this section shall take effect only if approved by 58% of the aggregate votes cast in a special election by the affected voters.

Pursuant to the enabling legislation, the City Council enacted, and then Mayor Kurt L. Schmoke signed, Ordinance No. 94–414, entitled "Charles Village Community Benefits District," which has been codified since the time in question at Subtitle 6 of Article XIV of the Baltimore City Code.[11] Section 6–3 of the Baltimore City Code expressly created the Authority and, like the enabling legislation, sets forth the purpose of the Authority: "to promote and market the District, provide supplemental security and maintenance services, provide amenities in public areas [and] provide park and recreational programs and functions," while the powers granted to the Authority, appearing in Section 6–4, include:

### § 6–4. Powers of Authority.

The Authority shall:

(1) not be or constitute or be deemed an agency of the City or the State of Maryland;

(2) to the greatest extent allowable by law, be deemed a special taxing district, and therefore a governmental body, both politic and corporate, exercising only such powers as are provided for in this subtitle;

(3) not exercise any power specifically withheld by the terms of either the Enabling Legislation {Article II, § (63) of the City Charter (1996 Edition)}, or if more restrictive, this subtitle. However, the powers of the Authority shall be broadly interpreted in order to allow the Authority to achieve the goals of the Enabling Legislation, including the provision of supplementary security and maintenance services, the promotion and marketing of the District, and the provision of amenities in public areas;

---

(2) The ordinance shall provide criteria for the eligibility of voters for the purposes of the election required by this subsection.

(3) The ordinance shall provide procedures for a special election as required in this subsection, which may be administered by write-in ballots.

**11.** Any references to the Baltimore City Code throughout are to Subtitle 6 of Article XIV of the Baltimore City Code, the provisions of which are presently the same as they were at the time in question in this case.

(4) acquire, hold, and use both real and personal property necessary to achieve its purposes, including the acquisition by purchase, lease, or other means;

(5) engage the services of an administrator (the "Administrator"), which may be an individual or an entity, to administer the programs and undertakings of the Authority;

(6) sue and be sued, provided that the District, the Authority, its Board of Directors, and the Administrator shall benefit, to the fullest extent allowable by law, from any provisions of federal, state, and local law limiting the liability of employees, officers, agents, and officials of governmental bodies;

\* \* \*

(9) adopt an annual budget and impose, charge, and collect the taxes or charges on benefitted properties within the District authorized by the Enabling Legislation and this subtitle; provided, however, that no taxes shall be levied against properties which are exempt under state law from ordinary property taxes;

\* \* \*

(11) establish and elect such officers of the Board as are not specified in this subtitle and provide for their terms and duties;

\* \* \*

(13) subject to the approval of the Board of Estimates, adopt, amend, and modify bylaws, consistent with the Enabling Legislation and this subtitle;

\* \* \*

(17) do all other things necessary or convenient to carry out its goals, objectives, and powers.

Consistent with the Authority's ability to "impose, charge, and collect the taxes or charges on benefitted properties within the District authorized by the Enabling Legislation,"

Section 6–8 of the Baltimore City Code dictates that a "Supplemental Tax shall be assessed and collected in conjunction with the property taxes assessed and collected by the City ('Regular Tax')" and that "[a]ny increase in the rate of the Supplemental Tax must be approved by a majority of the voting Board members." Even if the Supplemental Tax rate is not increased, however, the Board "shall adopt an annual financial plan . . . consisting of at least a proposed schedule of taxes or charges to be imposed throughout the District," Section 6–7 of the Baltimore City Code, which "shall be subject to the approval of the Board of Estimates." Section 6–14 of the Baltimore City Code.

In turn, Section 6–6(d) of the Baltimore City Code states that, "[t]he number of members of the full Board must be at least 14, excluding vacancies, and no more than 27," and that, "[t]he Board may increase or decrease its membership, within these limits." [12] Voting members of the Board "must be

---

12. Section 6–6(e) of the Baltimore City Code governs the required minimum representation on the Board:

(e) *Minimum representation.*
The following minimum representation shall be present on the full Board, except during periods of temporary vacancies:
(1) 1 voting member shall be appointed by the Mayor.
(2) 2 members shall be members of the City Council appointed by the President of the City Council.
(3) At least 8 voting Board members shall be from the following constituent organizations within the District:
(i) the Abell Improvement Association;
(ii) the Charles Village Civic Association;
(iii) the Old Goucher Community Association, and
(iv) the Harwood Community Association.
(4) At least 6 voting Board members shall be from the following constituent organizations within the District:
(i) the Better Greenmount Alliance,
(ii) the Old Goucher Business Alliance, Inc., and
(iii) the North Charles Village Business Association.
(5) The Board may contain additional members from the following constituent groups:
(i) 4 non-voting members from the neighborhood associations bordering the District; and
(ii) 2 non-voting members from the Midtown Churches, Inc., and the various non-profit organizations within the District.
(6) The Board may contain 4 at-large voting members.

eligible to vote in the election," Section 6–6(e)(7) of the Baltimore City Code; eligibility is limited to "owners of property within the District which is subject to tax" and "voters registered to vote within the District." Section 6–15(b) of the Baltimore City Code.

In addition to submitting proposed changes to the Supplemental Tax rate to the Board of Estimates, the Board also can "adopt such bylaws, rules, and regulations as it deems necessary in carrying out the powers of the Authority, so long as the same shall not be inconsistent with the terms of this subtitle or of any ordinance amendatory or supplementary hereof or of the Enabling Legislation." Section 6–6(g) of the Baltimore City Code. All bylaws adopted by the Board must be approved by the Board of Estimates. *Id.*

The seminal interim Board members of the Authority adopted bylaws on January 11, 1995.[13] Bylaw 2.12, entitled "Quorum and Voting," requires "[t]he actual presence of at least 9 voting members" for a quorum at all meetings of the Board and provides that, "[t]he act of a majority of voting members in attendance at a Board of Directors meeting at which a quorum is present shall be the act of the entire Board of Directors." The language in bylaw 5.03 goes further, however, stating that the Supplemental Tax rate "must be approved by a majority of all of the voting Board members."

---

(7) At least a majority of the Board shall be composed of owners or representatives of property owners subject to the tax imposed by this subtitle. A voting member of the Board must be eligible to vote in the election under § 6–15 of this subtitle.

(8) The Board shall endeavor to maintain representatives on the Board from professionals practicing in the District, the retail merchants within the District, and the tenants of properties in the District; however, no minimum representation shall apply.

(9) Consistent with the encouragement of partnerships between the Authority and property owners exempt from the tax imposed by this subtitle, the Board is encouraged to consider representation of such partners on the Board.

13. The bylaws were amended in 2004 and remain the same today as they did at the time in question.

Bylaw 2.09, on the other hand, states that, "[i]n the event of resignation, expiration or other departure from the Board of a member not appointed by an elected official or an association, a majority of the remaining directors, whether or not sufficient to constitute a quorum, may fill a vacancy on the Board of Directors." Board members "not appointed by an elected official or an association" include the four at-large voting members, each of whom is elected from one of the quadrants of the District under bylaw 2.07.

In the present case, Joan Floyd and other individuals subject to the Supplemental Tax ("Floyd") filed a complaint in the Circuit Court for Baltimore City against the Authority as well as the Mayor and City Council of Baltimore (the "City"). Floyd sought preliminary and permanent injunctive relief as well as a declaratory judgment, arguing that the adoption of the Supplemental Tax rate at the April 11, 2006 meeting "was beyond the powers of the Authority as enumerated in the Code and the Baltimore City Charter." Specifically, the complaint alleged that three voting Board members, Richard Burnham, Eric Friedman and Michael Gervais, were ineligible to vote at the April 11, 2006 meeting at which the Supplemental Tax was approved and that because there were an inadequate number of voting members present on April 11, 2006, the Board of Estimates "violated the express prohibition in both the Code and the Baltimore City Charter against approval of a Supplemental Tax in excess of what is proposed by the Authority," when it approved the proposed tax at a May 17, 2006 meeting, thereby rendering the Supplemental Tax null and void.

After Floyd filed her complaint, the Board held a special meeting on June 21, 2006 in order to "ratify some past actions of the [B]oard" and adopted a resolution containing the following provisions:

1. That the Board hereby approves the Authority's budget and the surtax rate for the Charles Village Community Benefits District for the fiscal year ending June 30, 2007, that were approved by the Board of Estimates of the City of Baltimore on or about May 17, 2006;

2. That the Board hereby ratifies and approves the actions of the Board taken at the December 13 meeting, including but not limited to the appointment of Michael Gervais to membership on the Board as a voting member, representing Quad 4;

3. That the Board hereby ratifies and approves the actions of the Board taken at the April 11 meeting, including but not limited to the Board's approval of the proposed budget for the Authority for the fiscal year ending June 30, 2007, and the Board's vote to keep the surtax rate of 12 cents per $100 of assessed value unchanged for the fiscal year ending June 30, 2007; and

4. That these resolutions have retroactive effect to the fullest extent necessary and allowed by law.

The record does not reflect that this resolution was submitted to the Board of Estimates and acted upon or that the Board of Estimates acted to ratify its own acts at its meeting on May 17, 2006.

The Circuit Court held a hearing on July 18, 2006, during which each party presented various exhibits, and the City called three witnesses to testify, including the Interim Administrator of the Authority, who testified that corporations that owned property in the District were listed as voters. The Circuit Court Judge, in a Memorandum Opinion, noted that Michael Gervais, one of the challenged Board members, was challenged because "he was 'appointed' at a December 13, 2005 meeting of the Authority Board to fill a vacancy occasioned by the resignation of a July elected Board member" and went on to articulate the issues and make various findings, none of which findings has been contested:

[Plaintiffs] primary argument is that the quorum requirement for passage of the FY 2007 budget, financial plan and supplemental tax should be a majority of all voting members of the Board of the Authority and that on the critical dates in question here ... the Board acted without a quorum present and voting, due to its inclusion in that voting

quorum of three Board members whose eligibility is here challenged.

\* \* \*

The meeting minutes of April 11, 2006 (defendants' Exhibit 5) indicates that there were ten voting and one non-voting members present. The motions to approve the FY 2007 proposed budget, to maintain the same surtax rate of 12¢ per $100 of assessed value and to send the approved budget to the Board of Estimates for final approval were all sustained by unanimous votes. Among the voting members were the three individuals whose voting eligibility is challenged by plaintiffs, Richard Burnham, Eric Friedman and Michael Gervais. Thus, in order for an appropriate quorum to be present at this meeting, at least two of the three challenged Board members had to be eligible to vote.

Richard Burnham testified that he had been a voting member of the Authority's Board for a period of five years and presently serves as its treasurer. His capacity to serve as a voting member of the Board arises from his representation of a constituent organization, The Old Goucher Business Alliance, Inc., which is allotted two voting members under Code, Art. 14, § 6–6(e)(4). Mr. Burnham further testified that he is the owner of a business, located within the District, known as Graphic Imaging, Inc., a sub-chapter S corporation of which he is the sole owner and president. Consequently, he personally pays the supplemental tax imposed on the property owned by Graphic Imaging, Inc.

Plaintiffs challenge Mr. Burham's eligibility to serve as a voting member of the Board. They point to Code, Art. 14, § 6–6(e)(7) which requires that a voting member of the Board be eligible to vote in the election under § 6–15 of the Code. By its express terms, § 6–15 limits eligible voters to "owners of property within the District which is subject to tax under § 6–8; and voters registered to vote within the District." Code, Art. 14, § 6–15(b). Because Mr. Burnham is not technically either an owner of property within the

District or registered to vote there, plaintiffs contend that he may not serve on the Board in a voting capacity.

\* \* \*

Plaintiffs do not dispute that Eric Friedman is the Mayor's current appointee to serve on the Authority's Board. Nor do they dispute that the Code, Art. 14, § 6–6(e)(1) authorizes the Mayor to appoint one voting member to the Board. Their contention with respect to Mr. Friedman is that he fails to meet the voting eligibility requirements of § 6–15 because he is neither an owner of property subject to the tax within the District nor a registered voter there. Defendants counter that the Board has never interpreted this provision to require the Mayor's representative, the only citywide voting representative on the Board, to comply with the technical requirements of § 6–15 and, alternatively, that the City owns property within the District, although it is exempt from the supplemental tax.

(Footnote omitted).

In denying Floyd relief, the judge concluded that Burnham, although "not technically an owner of property subject to the tax within the District," was the sole owner and president of a Subchapter S corporation who paid the Supplemental Tax on the property where his business was located and thus, was an eligible voting member. The judge noted, "[Burnham's] participation as a voting member of the Board is consistent with the provisions in all the governing documents calling for representatives of the professional and retail and tenant community to serve thereon." With respect to Friedman, the judge determined that Friedman was eligible, because "the record is void of any evidence establishing that Eric Friedman either does not own property in the District subject to the tax or that he is not a registered voter in the District." After the Circuit Court Judge held that nine voting members were necessary to constitute a quorum under the bylaws, he also held that there was a quorum present at the April 11, 2006 meeting, because both Burnham and Friedman were eligible voters.

With respect to the appointment of Gervais, the Circuit Court Judge concluded that because both Burnham and Friedman were eligible voting members, it was "unnecessary for the Court to determine whether [Gervais] became an eligible voting member of the Board on December 13, 2005, when he was appointed to fill a vacancy." The Memorandum Opinion, nonetheless, stated:

[W]ith the Court's findings today that a valid quorum was constituted by nine present voting members, and that Mr. Burnham and Mr. Friedman were eligible voting members, it does appear that Mr. Gervais' appointment was approved by the unanimous vote of the nine voting members present on that date (Defendants' Exhibit 3).

Mr. Gervais' status, therefore, hinges on Authority by-law 2.09, which governs the filling of vacancies of Board members not appointed by elected officials or associations. The by-law appears to permit the actions taken on December 13, 2005. The fact that Ms. Mayer's term had not yet begun points up a difficulty with the existing by-law because it does not contemplate such a situation. Nonetheless, Michael Gervais was selected by a majority of the remaining directors to fill her vacancy and he is entitled to serve until the next annual meeting or a new Board member from Quad 4 is elected and qualified. The Authority would be well advised to reconsider this by-law provision in light of its inconsistent interpretation and limited scope.

Floyd filed a Motion to Alter or Amend Judgment, alleging, in part, that the judge failed to decide whether bylaw 5.03(b) "required a majority, or 10 out of 19, of all voting members to approve the Supplemental Tax rate," and that "the City was the custodian of an official document proving that Eric Friedman was neither a registered voter within the District nor an owner of property subject to the Supplemental Tax." A hearing was held on the matter on August 22, 2006, during which a financial disclosure statement for Friedman was admitted, after which an Amended Declaratory Judgment was filed, which stated:

[T]he Court does not believe that plaintiffs have met their burden of proof by the introduction of admissible evidence to establish that Eric Friedman was neither an owner of property subject to the supplemental tax in the Benefits District nor a registered voter there. On the other hand, defendants cannot honestly contend that Mr. Friedman meets the voting member eligibility requirements of the Baltimore City Code, Art. 14, § 6–15(b). Nor is there any express provision in the Baltimore City Code, exempting the Mayor's appointed representative from those voting eligibility requirements. Thus, a reasonable interpretation of the Code provisions would be that the Mayor is entitled to appoint a voting member of the Authority's Board, so long as he chooses someone who otherwise meets the voting eligibility requirements of § 6–15(b). For the purposes of this Amended Declaratory Judgment, therefore, the Court will not predicate its decision upon Eric Friedman's eligibility to serves as a voting member of the Authority's Board.

The court concluded, nonetheless, that were Friedman's vote on April 11, 2006 not to be counted, "there were still nine votes to approve the supplemental tax rate, clearly a majority of the fourteen voting members required by § 5.03B," because Burnham was eligible to vote for the reasons stated in the July 26, 2006 Memorandum Opinion and Gervais was duly elected on December 13, 2006 under bylaw 2.09. As to Gervais, the Amended Declaratory Judgment stated:

In accordance with the by-laws of the Charles Village Community Benefits District and Management Authority § 2.09, Michael Gervais was duly elected to the Board of the Authority on December 13, 2005 to fill a vacancy occasioned by the departure of the recently elected Quad 4 Board representative, Tammy Mayer. He is entitled to serve on the Board until its next annual meeting or such earlier or later time as his successor is elected and qualifies. Giving full consideration to the concerns expressed in the Court's Memorandum Opinion of July 26, 2006, the Court nevertheless finds that Michael Gervais was a valid, voting member of the Authority's Board when it approved the FY 2007

budget, financial plan and supplemental tax on April 11, 2006.

Floyd appealed to the Court of Special Appeals, before which the parties reiterated their arguments previously articulated before the trial court. Subsequently, the Court of Special Appeals, in a reported opinion, affirmed the judgment of the Circuit Court.[14] *Floyd v. Mayor and City Council of Baltimore,* 179 Md.App. 394, 946 A.2d 15 (2008). In analyzing whether the Board properly set its own quorum "of at least 9 voting members" in bylaw 2.12, the Court of Special Appeals concluded that the Board had the authority to set a quorum of less than a majority of the nineteen authorized voting Board members, because it was a corporation subject to the Corporations and Associations Article:

> We also disagree with appellant's claim that there was no statutory authority authorizing the Authority to adopt By-law 2.12. There are, in fact, several independent sources of this authority.
>
> First, the Ordinance creating the Authority granted it the power, "subject to approval of the Board of Estimates," to "adopt, amend, and modify bylaws, consistent with the Enabling Legislation and this subtitle." Code, Art. 14, § 6–4(13). The Ordinance did not withhold from the Board the power to pass a bylaw setting a quorum of less than a majority, and Bylaw 2.12 is not in conflict with any provisions of the Enabling Law or the Ordinance. Second, the Authority's power to enact Bylaw 2.12 derives from C.A. § 2–408(b), which authorizes Maryland corporations to set quorums of less than a majority, and C.A. § 1–102, which provides that the Article applies to every Maryland corporation, except as otherwise provided by statute. In this

---

**14.** Before addressing the merits of the claim, the intermediate appellate court addressed two threshold matters, first dismissing the appeal "as to all persons other than Ms. Floyd," because of the failure of the *pro se* individuals to sign the notice of appeal and thereafter recognizing that the attorney for the City did have the authority to file a cross-appeal. *Floyd v. Mayor and City Council of Baltimore,* 179 Md.App. 394, 427–28, 946 A.2d 15, 34–35 (2008). Neither of these issues is before us.

regard, the Ordinance clearly states that, to the extent allowed under law, the Authority is a body corporate.

Appellant suggests that C.A. § 2–408(b) does not apply to the Board because it is a "governmental body." But, she cites no relevant authority to support her claim.

*Id.* at 436–37, 946 A.2d at 40.

The intermediate appellate court also affirmed the Circuit Court's decision that Gervais was properly appointed under bylaw 2.09, which did not contradict the Baltimore City Code or enabling legislation. The court also determined that Burnham was eligible to vote on April 11, 2006, because, although "he neither lived in nor personally owned property in the District," he was the owner of a corporation that did and the language of the Baltimore City Code "does not show any objective intent to restrict the meaning of the word 'owner' to include only natural persons." *Id.* at 450, 452, 946 A.2d at 48, 49. The Court of Special Appeals went on to further note there was testimony presented that "corporations that owned property subject to the Surtax were eligible voters in the referendum held to approve the establishment of the Authority." *Id.* at 452, 946 A.2d at 49. Finally, the court held that, because the Board left the Supplemental Tax rate unchanged and bylaw 5.03(D) only required a majority of the Board to approve the Supplemental Tax rate if it is attempting to change the rate, no Board action was necessary: ·

... Bylaw 5.03(D) only requires the Board to approve the supplemental tax rate if it seeks to change the rate. The Board left the rate unchanged, so it did not have to hold a vote on the Supplemental Tax. Consequently, no matter how we construe the meaning of the word "majority" in Bylaw 5.03(B), which applies to a change in the tax rate, there is no merit to appellant's challenge to the Board's approval of the Surtax.

*Id.* at 456, 946 A.2d at 51.

We disagree with the Court of Special Appeals that the Corporations and Associations Article applies to the Authority, because it is a public corporation, but we will affirm its

mandate as the actions related to the Supplemental Tax taken at the April 11, 2006 meeting of the Authority were valid, because a quorum was present, as Burnham, Friedman and Gervais were eligible voting members.

### Discussion

Floyd argues that the Board was required to transact business at a meeting according to the requisites of our cases, as opposed to the provisions of the Corporations and Associations Article, which she contends applies only to private corporations. According to Floyd, our case law requires ten voting members, a majority of the fully authorized voting membership of 19, to constitute a quorum. Floyd further asserts that even if the Corporations and Associations Article were to apply, so that a quorum would be constituted by nine voting members, on April 11, 2006, a quorum was not present, because out of the ten voting members present at that meeting, Burnham, who was neither the owner of property subject to the Supplemental Tax nor a registered voter in the District, was ineligible to vote as were Gervais, who was not appointed by a lawful quorum on the December 13, 2005 meeting, and Friedman.

Both the Authority and the City, conversely, assert that the Corporations and Associations Article, which states, in Section 2–408(b), that corporate bylaws may provide for a quorum of less than a majority, applies to the Authority, so that only nine voting members needed to be present at the April 11, 2006 meeting to conduct business. The Authority and City also contend that were our cases to apply, the Board, which may have anywhere from 14 to 27 members, was not a body of definite membership but was a body of indefinite membership, so that only eight voting members were required to be present at the April 11, 2006 meeting.

In response to the arguments of the Authority and the City, Floyd asserts that the Board was not an indefinite body ranging from 14 to 27 members, but instead a definite body consisting of 19 authorized voting seats, so that 10 voting members were required.

Primarily, we note that under Section 2–408(b)(2) of the Corporations and Associations Article [15] a corporation's "by-laws may provide that less than a majority, but not less than one-third of the entire board of directors, may constitute a quorum," so that the quorum of nine voting members set forth in the Authority's bylaws would be permissible if the Authority were a private corporation. We have recognized, however, that, "[t]o constitute a corporate assembly at common law, there must always be present a quorum, consisting of at least a majority of the number of all the members, and no valid act can be done without a majority of a quorum," so that either ten voting members, a majority of those authorized to serve as voting members, or eight voting members, a majority of those who occupied voting seats at the time of the April 11, 2006 meeting, needed to have been present. *Murdoch v. Strange*, 99 Md. 89, 110, 57 A. 628, 630 (1904). *See also Heiskell v. Mayor, Etc., of Baltimore,* 65 Md. 125, 151, 4 A. 116, 120 (1886) (stating that "the existing common law ... fixes the *majority* as the quorum") (emphasis in original).

▮ In the present case, no one has challenged the validity of the corporate status of the Charles Village Community Benefits District Management Authority. *See, e.g., Middleman v. Maryland–National Capital Park and Planning Comm'n,* 232 Md. 285, 288, 192 A.2d 782, 783 (1963) (challeng-

---

**15.** Section 2–408 of the Corporations and Associations Article provides, in part:

(a) *Majority rule.*—Unless this article or the charter or bylaws of the corporation require a greater proportion, the action of a majority of the directors present at a meeting at which a quorum is present is the action of the board of directors.

(b) *Quorum.*—(1) Unless the bylaws of the corporation provide otherwise, a majority of the entire board of directors constitutes a quorum for the transaction of business.

(2) The bylaws may provide that less than a majority, but not less than one-third of the entire board of directors, may constitute a quorum unless:

(i) There are only two or three directors, in which case not less than two may constitute a quorum; or

(ii) There is only one director, in which case that one will constitute a quorum.

ing the corporate status of the Maryland–National Capital Park and Planning Commission by alleging it was invalidly formed). Rather, the dispositive question is whether the Authority is a public corporation subject to the constitutional provisions governing charter home rule counties and, in turn, the common law, or whether the Authority is a corporation subject to the provisions of Section 48 of Article III of the Maryland Constitution and the Corporations and Associations Article, because the Court of Special Appeals' holding is premised on the latter.

This Court, heretofore, has had occasion to distinguish between public and private corporations, in *State v. Board of Education of Montgomery County,* 346 Md. 633, 645, 697 A.2d 1334, 1340 (1997), wherein we defined a public corporation as follows:

[P]ublic corporations [are] created by the Legislature for political purposes, with political powers, to be exercised for purposes connected with the public good, in the administration of civil government.

They are instruments of government subject at all times to the control of the Legislature with respect to their duration, powers, rights and property. It is of the essence of such a corporation, that the government has the sole right as trustee of the public interest, at its own good will and pleasure, to inspect, regulate, control and direct the corporation, its funds and franchises.

(Internal quotes omitted). *See also* Herbert M. Brune, Jr., *Maryland Corporation Law and Practice* § 2 (1953) ("It has been stated that the fundamental division of corporations is into public and private corporations.").

We also have had occasion to address whether a special tax district in Anne Arundel County was public in nature, in *Williams v. Anne Arundel County,* 334 Md. 109, 113, 638 A.2d 74, 75 (1994), in which real property owners in the Cape St. Claire Community Benefits District sought to invalidate the Anne Arundel County ordinance creating the District, alleging that the tax was "not for a public purpose." In validating the

ordinance, we took the opportunity to describe a special assessment, as a " 'tax levied ... upon a limited class of persons interested in local improvements, and who are presumed to be benefitted by the improvement,' " which must have a " 'public purpose' " and confer " 'a special benefit to the properties to be assessed over and above that accruing to the public' ":

"The use of such 'special assessments' has a long history in the United States." O. Reynolds, Jr., Local Government Law § 99, at 300 (1982) (footnote omitted). In *Gould v. Mayor & City Council of Baltimore*, 59 Md. 378 (1883), this Court contrasted special assessments with the general property tax, saying:

"The right to make such assessments is undoubtedly an exercise of the taxing power, but an assessment thus made differs from a general tax levied for State and city purposes. The latter is a tax imposed on all persons within the territorial limits according to the value of their property, in consideration of the protection, which the government affords alike to all. A local assessment, on the other hand, is a tax levied occasionally as may be required upon a limited class of persons interested in local improvement, and who are presumed to be benefitted by the improvement over and above the ordinary benefit which the community in general derive from the expenditure of the money. In the payment of the assessment thus made, the adjacent owner is supposed to be compensated by the enhanced value of his property, arising from the improvement."

*Id.* at 380.

"In order to justify a special assessment for a local improvement ... there must be both a public purpose and a special benefit to the properties to be assessed over and above that accruing to the public." *Montgomery County v. Schultze*, 302 Md. 481, 489, 489 A.2d 16, 20 (1985). *See also Silver Spring Memorial Post No. 2562, Veterans of Foreign Wars v. Montgomery County*, 207 Md. 442, 448, 115 A.2d 249, 251 (1955). One treatise expands on the concept, as follows:

"In order to justify a local assessment the improvement must be a public one; that is, it must be one which confers a general benefit upon the public at large, and which, therefore, the public acting through its government may construct without the consent of the particular individuals affected thereby. Local assessment for benefits is a form of taxation and the very nature of taxation implies that it is for a public interest. An improvement which lacks this element is essentially a private improvement, and no matter how useful or advantageous it may be, the public cannot compel its construction, nor can it pay therefor by funds raised by general taxation."

1 W. Page & P. Jones, *Taxation by Local and Special Assessments* § 283, at 439 (1909) (footnotes omitted).

Although special benefit assessments were first utilized to finance certain capital improvements, typically elements of the infrastructure of local government, special benefit assessments may also be used to finance the operating expenses of local government for services beneficial to property in an area. *See Pumphrey v. County Comm'rs of Anne Arundel County,* 212 Md. 536, 130 A.2d 297 (1957) (rejecting landowner's challenge to a benefit assessment for garbage collection imposed against realty occupied by tenant); *City of Seattle v. Rogers Clothing for Men, Inc.,* 114 Wash.2d 213, 787 P.2d 39 (1990) (sustaining special assessment for promotional activities, cleaning, decorating, and security in the central business district of Seattle). *See generally* O. Reynolds, Jr., *supra,* § 15, at 38.

*Id.* at 117–18, 638 A.2d at 77–78. This Court then concluded that the tax was properly levied, because the use of tax monies for general property maintenance, pier construction, outdoor lighting, security, sanitary facilities, and the construction of a storage facility, among others, benefitted people in the District and had a public purpose, enhancing the quality of life as well as property values in the assessment area. *Id.* at 119, 122, 638 A.2d at 78, 80. We also noted that the Association, the corporation that submitted a requested budget and tax for the District to the County, was simply "the vehicle or instrumen-

tality that the County Council has recognized to administer and expend the special benefit assessments imposed and collected by the County." *Id.* at 125, 638 A.2d at 82. *See also Housing Auth. of Baltimore City v. Bennett,* 359 Md. 356, 362, 754 A.2d 367, 370 (2000) (noting that special tax districts are included as local government entities for tort purposes); *Waters Landing Ltd. Partnership v. Montgomery County,* 337 Md. 15, 39, 650 A.2d 712, 723 (1994) (stating that special taxing districts may be a creature of either the county or the State); *Council of Chevy Chase View v. Rothman,* 323 Md. 674, 678, 688, 594 A.2d 1131, 1133, 1138 (1991) (demonstrating that special taxing districts are governed by the county and subject to the limitations placed on the county by the General Assembly); *Nordheimer v. Montgomery County,* 307 Md. 85, 101, 512 A.2d 379, 387 (1986) (characterizing special taxing districts as "local government agencies").

Similar to property owners in the Cape St. Claire area of Anne Arundel County discussed in *Williams,* residents and business owners in Charles Village enjoy the specific benefits provided by the Authority, including additional security and maintenance, public amenities and park and recreational services.[16] The powers of the Authority, consistent with those of public corporations, are "exercised for purposes connected with the public good," *see State v. Bd. of Education of Montgomery County,* 346 Md. at 645, 697 A.2d at 1340, and this public purpose confers a special benefit on the residents of Charles Village. *See Williams,* 334 Md. at 122, 638 A.2d at 80. As a result, the Authority is properly classified as a public

---

**16.** Specifically, the Authority was tasked with "provid[ing] services ... to the business interests and residents of the proposed district," as well as "promot[ing] and market[ing] districts, provid[ing] supplemental security and maintenance services, provid[ing] amenities in public areas [and] provid[ing] park and recreational programs and functions." Chapter 732 of the Maryland Laws of 1994, now codified as Section 63 of Article II of the Baltimore City Charter. Section 6–11 of the Baltimore City Code, moreover, makes reference to "the broad objectives of improving and enhancing public services throughout the District."

corporation.[17]

Such a conclusion is bolstered by Section 6–4(2) of the Baltimore City Code, which deems the Authority "a governmental body, both politic and corporate." Section 63(e)(8) of Article II of the Baltimore City Charter, which provides that the Authority may not "be an agency of the Mayor and City Council of Baltimore or the State of Maryland," does not undermine the public nature of the Authority, nor determine whether it is a local governmental agency. The language of Section 63(e) is that of a disclaimer to avoid the application of agency principles, because "special taxing district[s]" are explicitly included in the definition of "local government" entities subject to certain actions in tort under the Local Government Tort Claims Act. *See* Section 5–301(d) of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2006 Repl. Vol.). The language of disclaimer, however, does not affect our characterization of the Authority as a public corporation.

The Authority disputes that it is a "public" corporation, however, asserting that the provisions of Section 48 of Article III of the Maryland Constitution authorizes its corporate status, and as a "Maryland corporation" it is subject to the Corporations and Associations Article;[18] the first sentence of Section 48 of Article III of the Maryland Constitution states:

**Section 48. Corporations.**

Corporations may be formed under general laws, but shall not be created by special Act, except for municipal purposes and except in cases where no general laws exist, providing for the creation of corporations of the same general character, as the corporation proposed to be created.

---

**17.** Special tax districts are not municipal corporations. *See* Section 9 of Article 23A of the Maryland Code (1957, 2005 Repl.Vol.) ("The General Assembly hereby finds, determines and declares that the term 'municipal corporation' in Article XI–E of the Maryland Constitution does not embrace or include any such special tax area or district or the board, commission, authority or public corporation administering the same.").

**18.** Section 1–102 of the Corporations and Associations Article states that the Article "appl[ies] to every Maryland corporation."

Our recognition that the Authority, as a special tax district, has a public purpose undermines the Authority's premises regarding the applicability of this language, because we have determined the first sentence of Section 48 of Article III is inapplicable to corporations that are public in nature. *Atlantic Golf, Ltd. Partnership v. Maryland Economic Dev. Corp.*, 377 Md. 115, 125, 832 A.2d 207, 212–13 (2003). In *Atlantic Golf*, we expressly stated that "[t]he first and second sentences of § 48, adopted in 1851, suggest that § 48 is limited in its application to private corporations." *Id.*

■ We also, in *Atlantic Golf*, 377 Md. at 115, 832 A.2d at 207, had occasion to address the applicability of Acts of the General Assembly to State entities. Although a definitional provision of the Corporations and Associations Article was utilized to define a corporate "charter," Judge John C. Eldridge, writing for this Court in *Atlantic Golf*, emphasized that unless an enactment expressly provides that it applies to a governmental entity, it is generally deemed to not apply, because " 'it is a basic and long-standing principle of statutory construction that the State is not deemed to be bound by an enactment of the General Assembly unless the enactment specifically names the State or manifests a clear and indisputable intention that the State is to be bound.' " *Id.* at 126–27, 832 A.2d at 214, citing *Baltimore v. State*, 281 Md. 217, 223–24, 378 A.2d 1326, 1329–30 (1977). The Corporations and Associations Article does not expressly provide for its provisions to apply to special tax districts, which are considered local government entities, *see, e.g., Bennett*, 359 Md. at 362, 754 A.2d at 370 (noting that special tax districts are included as local government entities for tort purposes), and, accordingly, the Authority, as a local government entity, cannot be bound by the provisions therein. *See Atlantic Golf*, 377 Md. at 126–27, 832 A.2d at 214, citing *Baltimore v. State*, 281 Md. at 223–24, 378 A.2d at 1329–30.

■ Having concluded that the Authority is a public corporation, not subject to the quorum provisions of the Corporations and Associations Article, we turn now to whether a

sufficient number of voting members was present at the Authority's April 11, 2006 meeting at which the Supplemental Tax was approved. Bylaw 5.03(D) of the Authority's bylaws provides that changes in the Supplemental Tax rate must be approved by "a majority of all the voting Board members," but the parties dispute whether a "majority of all the voting Board members" consists of ten voting members, a majority of the fully authorized voting membership of 19, or eight voting members, a majority of the 14 individuals who occupied voting seats at the time of the meeting. Whether the relevant majority on April 11, 2006 was eight or ten, however, is irrelevant to our analysis, because we shall conclude that ten voting members were present to approve the Supplemental Tax.

█ With respect to Richard Burnham, the Circuit Court found that although he neither individually owned property within the District nor was registered to vote therein, he was the sole shareholder of a Subchapter S corporation that owned property and payed the Supplemental Tax individually. Based on those facts, both the circuit court and Court of Special Appeals concluded that he was an eligible voting member, because he met the eligibility criteria to vote on the establishment of the District. We agree.

Burnham's eligibility hinges upon whether a sole shareholder in a Subchapter S corporation is a "person[ ] eligible to vote," such as he or she may serve as a voting member of the Board. Under the enabling legislation, now codified at Section 63(c)(4) of Article II of the Baltimore City Charter, "[a] voting member of the board must be eligible to vote in the election under subsection [ (k)] of this section," which, in turn, states that "[t]he ordinance shall provide criteria for the eligibility of voters for purposes of the election required by this subsection." Section 6–15 of the Baltimore City Code is the ordinance providing the eligibility criteria for voters and governs the maintenance of a list of eligible voters in addition to the eligibility criteria and states, in part:

(a) *List of eligible voters.*

The Board of Estimates, with the assistance of the interim Board, the Department of Finance, and the Supervisor of the Board of Elections, shall be responsible for compiling a list of those persons eligible to vote on the establishment of the District and on any question relating to its renewal.

(b) *Eligibility criteria.*

The following persons are eligible to vote subject to the limitations that no person may have more than 1 vote:

(1) owners of property within the District which is subject to the tax under § 6–8; and

(2) voters registered to vote within the District.

Burnham is eligible to vote based on the eligibility criteria under Section 6–15(b) of the Baltimore City Code. The plain meaning of the word "owner" is "[o]ne who has the right to possess, use, and convey something." Black's Law Dictionary 1136 (8th ed.2004). As the sole shareholder of an S corporation Burnham, although not personally the owner of the property, effectively had "the right to possess, use, and convey" the property. Additionally, the Interim Administrator of the Authority testified that in compiling the list of eligible voters under Section 6–15(a) of the Baltimore City Code, corporations that owned property in the District were included. Clearly, the corporation, as an eligible voter, could vote only through a representative, such as Burnham.

Section 6–6 (e) of the Baltimore City Code, moreover, states that "[a]t least a majority of the Board shall be composed of owners or representatives of property owners subject to the tax imposed by this subtitle" and that "[t]he Board shall endeavor to maintain representatives on the Board from the professionals practicing in the District, the retail merchants within the District, and the tenants of properties in the District." The inclusion of "representatives of property owners" and the "endeavor" to include "professionals practicing in the District," and "retail merchants within the District" on the Board, supports our conclusion that the drafters of the Baltimore City Code intended that representatives of corporations subject to the tax be included as voting Board members.

■ Eric Friedman's eligibility to vote when the Supplemental Tax was adopted was also challenged by Floyd; she alleged that he neither owned property subject to the Supplemental Tax nor was registered to vote in the District as required by Section 6–15(b) of the Baltimore City Code, but failed to maintain a successful challenge. The Circuit Court Judge in his original Declaratory Judgment and Memorandum Opinion, noted that "[p]laintiffs' claim with respect to Mr. Friedman must fail for a want of evidence," because "the record is void of any evidence establishing that Eric Friedman either does not own property in the District subject to the tax or that he is not a registered voter in the District." In his subsequent amendment, the judge determined that the plaintiffs' failed to "me[et] their burden of proof by the introduction of admissible evidence to establish that Eric Friedman was neither an owner of property subject to the supplemental tax in the Benefits District nor a registered voter there."

■ With respect to whether Michael Gervais was properly appointed to fill a vacancy on the Board at the December 13, 2005 meeting, the judge found that under bylaw 2.09 "Michael Gervais was duly elected to the Board of the Authority on December 13, 2005 to fill a vacancy occasioned by the departure of the recently elected Quad 4 Board representative." Floyd, however, argues that when Gervais was appointed at the December 13, 2005 meeting, again, there was not a sufficient quorum to enable Gervais to be a voting member on April 11, 2006.

Section 6–6 (c)(3) of the Baltimore City Code provides that: "In the event of resignation, expiration, or other departure from the Board, or removal in accordance with the bylaws of the Authority, of any member of the Board, successors shall be elected by the remaining members of the Board." Bylaw 2.09 also states that, "[i]n the event of resignation, expiration or other departure from the Board of a member not appointed by an elected official or an association, a majority of the remaining directors, whether or not sufficient to constitute a quorum, may fill a vacancy on the Board of Directors."

■ There were 11 voting members on the Board on December 13, 2005, nine of whom were present and unanimously approved Gervais's appointment. The nine were sufficient to constitute "a majority of the remaining directors" under bylaw 2.09 rendering Gervais's appointment proper. Although Floyd argues that the bylaws could not derogate common law quorum requirements, Section 2 of Article XI–A of the Maryland Constitution specifically allows the General Assembly to grant express powers to charter home rule jurisdictions. Two of these express powers granted to Baltimore City include the power "to adopt, amend and modify bylaws" and the power "to do all things necessary or convenient to carry out its powers." Chapter 732 of the Maryland Laws of 1994, now codified as Section 63(d) of Article II of the Baltimore City Charter. Clearly, then, the Authority and City had the power to enact bylaw 2.09.

In conclusion, we hold that the Authority is a public corporation, and not subject to the quorum requirements of the Corporations and Associations Article and that at the April 11, 2006 Board meeting at which the Supplemental Tax was approved for submission to the Board of Estimates, there were ten voting members, a sufficient number to approve the Tax.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**