*Karunaker Aleti, et ux. v. Metropolitan Baltimore, LLC, et al.*, No. 459, September Term, 2020. Opinion by Fader, C.J.

**LANDLORD AND TENANT — LOCAL LICENSING ORDINANCE — FAILURE TO LICENSE RENTAL PROPERTY — PRIVATE RIGHT OF ACTION**

Article 13, § 5-4(a)(2) of the Baltimore City Code, which prohibits a landlord from charging, accepting, retaining, or seeking to collect rent for a rental property unless the property is properly licensed, does not provide tenants with a private right of action to collect a refund of rent and related fees already paid to a landlord who was unlicensed during the rental term but who otherwise complied fully with the lease agreement. Tenants could not recover rental payments and related fees paid to the landlord based solely on the landlord's lack of a license.

**LANDLORD AND TENANT — ACTION FOR MONEY HAD AND RECEIVED**

The common law cause of action for money had and received lies when a defendant has obtained possession of money that, in equity and good conscience, the defendant should not be allowed to retain. The circuit court correctly dismissed the tenants' claim for money had and received to the extent that the tenants sought to recover rent based solely on the lack of licensure because the landlord had provided all that was bargained for under the lease and there were no allegations that the property was deficient.

However, the court erred in dismissing the claim for money had and received to the extent that the tenants sought restitution of any legal fees the landlord collected when it was unlicensed, where the tenants alleged that the landlord had brought unlawful actions for nonpayment of rent, made false representations as to its licensure status, and had collected and retained those legal fees.

**DECLARATORY JUDGMENT — REQUIREMENT TO ISSUE DECLARATION OF RIGHTS AND OBLIGATIONS**

A ruling on the substantive counts of a lawsuit in which a plaintiff also seeks a declaratory judgment does not render the declaratory judgment claim moot or non-justiciable.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 459

September Term, 2020

——————————————————————

KARUNAKER ALETI, ET UX.

v.

METROPOLITAN BALTIMORE, LLC,
ET AL.

——————————————————————

Fader, C.J.,
Shaw Geter,
Zarnoch, Robert A.
    (Senior Judge, Specially Assigned),

JJ.

——————————————————————

Opinion by Fader, C.J.

——————————————————————

Filed: July 6, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Subsection 5-4(a)(1) of Article 13 of the Baltimore City Code prohibits any person from renting or offering to rent a dwelling "without a currently effective license to do so from the Housing Commissioner[.]" Subsection 5-4(a)(2) of that article prohibits any person from charging, accepting, retaining, or seeking to collect rent for a rental dwelling unless the person was properly licensed at the time of both the offer to provide the dwelling and the occupancy. In this appeal, we must determine whether subsection (a)(2) provides tenants a private right of action to collect a refund of rent and other fees already paid to a landlord who was unlicensed during a portion of a rental term, but who otherwise complied fully with the rental agreement for the dwelling. Relying on well-established principles of statutory interpretation, contract law, and equity, we conclude that subsection (a)(2) does not provide such a right with respect to rent and related fees. Accordingly, we will affirm the judgment of the Circuit Court for Baltimore City to the extent that court held that the tenant plaintiffs did not have a right to recover rent already paid to the landlord defendants.

We will, however, reverse two aspects of the circuit court's judgment: (1) its entry of judgment in favor of the landlords on the common law count of money had and received, to the extent that the tenants seek to recover legal fees attributable to the landlords' attempts, while unlicensed, to use the courts to collect rental fees; and (2) its dismissal of the tenants' request for a declaratory judgment. We will remand for further proceedings consistent with this opinion.[1]

---

[1] This appeal does not present the issue of whether a landlord may use the courts to enforce any obligations purportedly owed under a lease during a period in which the landlord was unlicensed, nor does it present any issues concerning a landlord's right to

**BACKGROUND**

Karunaker and Chandana Aleti (the "Aletis"), the appellants, brought this action in the Circuit Court for Baltimore City against the appellees, Metropolitan Baltimore, LLC, the owner of 10 Light Street, an apartment building located in Baltimore City, and Gables Residential Services, Inc., the property manager for 10 Light Street. For ease of reference, we will refer to both entities collectively as "Metropolitan." The Aletis alleged that for a period of approximately ten months while they were tenants of 10 Light Street, Metropolitan did not hold an active rental license for the property as required by Article 13, § 5-4(a)(1) of the Baltimore City Code. The Aletis, unaware of the lack of licensure, paid rental and other fees to Metropolitan, which they then sought to recover through this action. The Aletis also sought (1) certification as a class action to pursue recovery of rental and other fees that similarly situated tenants paid to Metropolitan during the same period, and (2) a declaratory judgment that Metropolitan could not collect unpaid rent and other fees that accrued during the time it was unlicensed. We will begin by exploring the statutory scheme on which the Aletis' claim is based.

*The Statutory Scheme: Article 13 of the Baltimore City Code*

Article 13 of the Baltimore City Code is "a comprehensive statutory scheme aimed at 'establish[ing] minimum standards governing the condition, use, operation, occupancy, and maintenance of dwellings . . . in order to make dwellings safe, sanitary, and fit for

---

evict a tenant under any circumstances. The sole question presented is whether the appellant tenants may recover from the appellee landlord amounts they previously paid upon discovering that the property was unlicensed at the time they made the payments.

2

human habitation.'"[2]  *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 81 (2003) (alteration and omission in original) (quoting Baltimore City Code (2000), Art. 13, § 103(a)(2)), *abrogated on other grounds by Ruffin Hotel Corp. of Md. v. Gasper*, 418 Md. 594 (2011). Section 2-1, which states determinations and declarations of the Baltimore City Council supporting its adoption of Article 13 and establishment of the City's Department of Housing and Community Development, identifies a broad focus on the City and its residents generally.  In relevant part, § 2-1 states:

(a) *Determinations.*

It is hereby found and determined:

(1) that there exist within the City of Baltimore slum, blighted, deteriorated, or deteriorating areas, which constitute a serious and growing menace, injurious and inimical to the public health, safety, morals and general welfare of the residents of the City of Baltimore;

(2) that the existence of such areas and the growth and spread thereof and the deterioration or threatened deterioration of other areas:

(i) contribute substantially and increasingly to the spread of disease and crime, and to losses by fire and accident;

(ii) necessitate excessive and disproportionate expenditures of public funds for the preservation of the public health and safety, for crime prevention, correction, prosecution, and punishment, for the treatment of juvenile delinquency, for the maintenance of adequate police, fire, and accident protection, and for other public services and facilities;

(iii) constitute an economic and social liability;

(iv) substantially impair or arrest the sound growth of the community;

---

[2] Unless otherwise specified, all statutory references in this opinion are to Article 13 of the Baltimore City Code.

3

(v) retard the provision of decent, safe, and sanitary housing accommodations;

(vi) aggravate traffic problems . . .;

(vii) depreciate assessable values;

(viii) cause an abnormal exodus of families from the city; and

(ix) are detrimental to the health, the well-being and the dignity of many of the residents of the City of Baltimore;

(3) that such areas cannot be dealt with effectively by the ordinary operations of private enterprise without the aids herein provided;

(4) that the rehabilitation or elimination, in whole or in part, of slum, blighted, deteriorated, and deteriorating areas . . . are public uses and purposes requiring the exercise of the governmental powers of the City of Baltimore in the public interest.

(b) *Declarations.*

(1) It is further found and declared that . . . areas not yet deteriorated or deteriorating, or portions thereof, may be conserved so that the conditions and evils hereinbefore enumerated may be prevented from spreading thereto or arising therein; and that all such areas within the boundaries of the City of Baltimore may be benefitted through the enforcement of applicable regulatory codes relating to buildings, housing, sanitation or safety, the rendering of services to community organizations or through a combination of other means provided in this ordinance.

(2) It is further found and declared that the elimination, correction, and prevention of the conditions and evils hereinbefore enumerated must be undertaken through the use of a comprehensive and integrated program; that this program should involve whatever range of municipal powers and resources is required to enable the City of Baltimore to act affirmatively in fulfilling its responsibilities to its citizens; that this program requires a suitable administrative structure to undertake adequately a coordinated and purposeful attack on urban slums and blight and the prevention of new areas of slums and blight; and that a comprehensive program should be undertaken within the boundaries of the City of Baltimore.

4

(3) It is further found and declared that the powers conferred by this ordinance *{subtitle}* are for public uses and purposes for which public money may be expended and the power of eminent domain exercised and that the necessity in the public interest for the provisions herein enacted is hereby declared and determined.

This appeal most directly concerns Subtitle 5 of Article 13, which governs the licensing of rental dwellings. Section 5-4(a), as it applied at the time relevant to this appeal,[3] provides:

§ 5-4. License required.

(a) *In general.*

Except as provided in subsection (b) of this section,[4] no person may:

(1) rent or offer to rent to another all or any part of any rental dwelling without a currently effective license to do so from the Housing Commissioner; or

(2) charge, accept, retain, or seek to collect any rental payment or other compensation for providing to another the occupancy of all or any part of any rental dwelling unless the person was licensed under this subtitle at both the time of offering to provide and the time of providing this occupancy.

Section 5-5 requires owners and managers of a rental dwelling to apply for new and renewal licenses, the prerequisites for which are set forth in § 5-6. Those prerequisites

---

[3] Subtitle 5 was amended in 2018 by the enactment of Ordinance 18-130. That ordinance, among other things, extended the subtitle's licensing requirements to all rental properties in the City of Baltimore, including properties containing only one or two dwelling units; implemented new inspection requirements for rental dwellings; and added the provision that now appears at § 5-4(a)(2). At the time Metropolitan lacked licensure, these new provisions had only recently gone into effect.

[4] Section 5-4(b) excepts from the license requirement rental dwellings that are owned and operated by the Housing Authority of Baltimore City. Because that exception is not at issue in this case, we do not address it.

5

include that all dwelling and rooming units must be properly registered; all registration fees must be paid; and the premises must have passed inspection, be in compliance with all laws and regulations pertaining to lead paint, and not be subject to any unabated violation notices or orders under the City's building, fire, or related codes. *Id.* § 5-6.[5]

Subtitle 5 also contains enforcement provisions. Section 5-17 permits the Housing Commissioner to require that an unlicensed rental dwelling be vacated within 24 hours if "vacating the premises is necessary for the public health, safety, and welfare." Under § 5-25, issuance of an environmental citation is an available, non-exclusive remedy to enforce the ordinance. Section 5-26 makes any violation of the subtitle a misdemeanor subject to punishment by "a fine of not more than $1,000 for each offense," with each day a violation continues constituting a separate offense.

***The Lease***

On May 31, 2019, the Aletis entered a lease agreement with Metropolitan to rent an apartment on the 16th floor of 10 Light Street for a one-month term beginning on June 1, 2019 and expiring on June 30, 2019, subject to automatic renewals on a monthly basis (the "Lease"). Pursuant to the Lease, the Aletis were obligated to pay monthly rent of $1,435.00, subject to a late fee of $71.75 if not paid by the fifth day of the month due. The Lease also contains a utility and services addendum providing that the Aletis were required

---

[5] Other provisions of Subtitle 5 establish requirements for inspections by third-party home inspectors or governmental agencies, *id.* § 5-7, the terms of new and renewal licenses, *id.* § 5-9, requirements applicable to the posting and transfer of licenses, *id.* §§ 5-11 & 5-12, provisions relating to the denial, suspension, or revocation of licenses, *id.* §§ 5-15 & 5-16, and a prohibition against impairing constitutional rights, *id.* § 5-19.

to pay certain service charges billed by third parties through Metropolitan for water and sewer service, electric service, and hot water, as well as a flat monthly fee for trash service. The Lease provides that all sums of money required to be paid under it, "whether or not . . . designated as 'rent' or as 'additional rent,' will be deemed to be rent and will be collectible as such."

Two other provisions of the Lease are particularly applicable to the Aletis' claims. First, in a paragraph pertaining to tenant defaults, the Lease provides that, with certain exceptions, the prevailing party will be entitled to recover "attorney's fees and all other litigation costs." The Lease does not otherwise reference charges for legal fees. Second, the final numbered paragraph of the Lease, ¶ 44, provides:

> It is the intent of the parties to comply with the laws of Maryland, including local county and municipal ordinances. . . . In the event no other addendum is attached to this Apartment Lease Contract and the local laws or ordinances provide additional rights or remedies not included herein, this Apartment Lease Contract is amended by reference to such local laws and ordinances to incorporate the terms, rights, or remedies thereof herein. It is the intent of the parties to have this lease construed to include any such rights or remedies herein, and the provisions of such laws or ordinances shall supercede [sic] and control over the language of this Apartment Lease Contract to the extent they are in conflict. . . .

### The Complaint

On February 24, 2020, the Aletis filed their complaint, in which they alleged that Metropolitan had violated § 5-4 by charging them rent, related service fees, and legal fees while unlicensed. The Aletis alleged that although the rental property had previously been registered and licensed, the licensure had lapsed on April 9, 2019 and was not renewed until February 7, 2020, a period of 302 unlicensed days. The Aletis alleged that during that

7

period, Metropolitan had improperly charged them a total of $12,825.00 in rent; $50.00 in application fees; $1,675.00 as a security deposit; $1,639.54 in water, electric, and other utility fees; $90.00 in trash fees; $240.00 in legal fees; $498.75 in late fees; and a $35.00 bank fee. The Aletis also alleged that during the unlicensed period, Metropolitan had filed complaints in the District Court for nonpayment of rent in which it had "falsely represented . . . that [10 Light Street] was licensed[.]"

In addition to themselves, the Aletis sought to represent "a class consisting of all tenants who occupied a rental unit at 10 Light Street at any time from April 10, 2019, through February 6, 2020, and paid rent or any other compensation to [Metropolitan] for the occupancy or Legal Fees[.]" The Aletis alleged that they met the numerosity requirement for a class action because the class would contain "more than 100 members . . . because the Rental Property is advertised as having 419 separate rental units."

The complaint contained four counts. In Count I, the Aletis requested a declaratory judgment that the leases "entered into between April 10, 2019, through February 6, 2020, are void and unenforceable and that [Metropolitan] may not file [court actions for failure to pay rent] or collect Legal Fees, rent and other compensation during the 302 days when the Rental Property was not properly registered and/or licensed." In Count II, the Aletis sought money damages, in the amount of all rent and other compensation paid to Metropolitan during the 302 days it was unlicensed, for Metropolitan's violation of § 5-4(a). In Count III, the Aletis sought to recover the same amounts plus a refund of legal fees as restitution damages based on the common law cause of action for money had and

8

received.  And in Count IV, the Aletis alleged breach of contract based on ¶ 44 of the Lease, which they contended incorporated § 5-4(a).

### *The Motion to Dismiss*

Metropolitan moved to dismiss all counts of the complaint on the grounds that the Aletis' statutory count failed for lack of a private cause of action, their common law count failed because the contract had been fully executed, and their breach of contract count failed because they had received all of the benefits for which they contracted and had not sustained any damages.  Metropolitan further contended that the Aletis' declaratory judgment count should be dismissed as moot if the court dismissed the other counts.  The Aletis opposed dismissal.

On June 24, 2020, after a hearing, the circuit court granted the motion to dismiss all counts of the complaint.  The court agreed with Metropolitan that § 5-4(a) did not create a private cause of action.  In dismissing the count for money had and received, the court found that the Aletis had failed to plead with specificity "that they paid more than what they would have paid" but for the violation of § 5-4.  And, having found that the Aletis had no claim under § 5-4(a) itself, the court concluded that they also had no contractual claim based on the incorporation of that provision into the Lease.  The court then declined to issue a declaratory judgment because, based on the dismissal of "the substantive counts, there remains no issue of justiciable controversy for which a declaratory judgment would be warranted."

Following the entry of a written order dismissing the complaint, the Aletis timely appealed.

## DISCUSSION

"We review a trial court's grant of a motion to dismiss, without deference, to determine whether it was legally correct." *Barclay v. Castruccio*, 469 Md. 368, 373 (2020). "In considering the legal sufficiency of a complaint . . ., we must assume the truth of all relevant and material facts that are well pleaded and all inferences which can be reasonably drawn from those pleadings," in the light most favorable to the non-movant. *Id.* at 373-74 (quoting *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 121 (2007)). "The well-pleaded facts setting forth the cause of action must be pleaded with sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice." *RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 644 (2010). "The granting of a motion to dismiss is proper only if 'the allegations and permissible inferences, if true, would not afford relief to the plaintiff, i.e., the allegations do not state a cause of action.'" *Barclay*, 469 Md. at 374 (quoting *Lloyd*, 397 Md. at 121).

### I. LEGAL BACKGROUND

The Aletis' claim for a return of all rent and other fees paid to Metropolitan attributable to the 302-day period during which 10 Light Street was unlicensed is based on the prohibition in § 5-4(a)(2) against

> charg[ing], accept[ing], retain[ing], or seek[ing] to collect any rental payment or other compensation for providing to another the occupancy of all or any part of any rental dwelling unless the person was licensed under this

10

subtitle at both the time of offering to provide and the time of providing this occupancy.

Except to the extent that the Aletis contend that § 5-4(a)(2) was incorporated by reference into the Lease, they do not contend that Metropolitan failed to comply with any terms of the Lease, that the apartment they rented was deficient or defective in any way, or that they failed to receive the full benefit of the apartment and other services covered by the Lease.

This appeal concerns one aspect of the effect on the landlord-tenant relationship of Metropolitan's failure to comply with a local ordinance requiring licensure of rental properties—here, § 5-4(a)(1). The Court of Appeals has previously explored similar claims arising under the licensing schemes of other Maryland jurisdictions. Although the governing ordinances and causes of action at issue in those cases differ from those here— and, most significantly, none of those licensing schemes included a provision similar to § 5-4(a)(2)—those cases nonetheless provide important guidance for our analysis. As a result, before we engage directly with the Aletis' contentions concerning § 5-4(a)(2), we will explore those precedents.

In *CitaraManis v. Hallowell*, the Court of Appeals considered whether tenants who learned that their rented property was unlicensed in violation of a Howard County ordinance could recover one-and-a-half years of rent they had voluntarily paid during the term of the lease. 328 Md. 142, 144-45 (1992). The tenants acknowledged the property had been in acceptable condition during the rental period. *Id.* at 145. However, after learning that the property was not properly licensed, they filed suit to recover the amounts

11

they had paid as damages under the Consumer Protection Act and as restitution because of the unenforceable lease. *Id.*

After the circuit court ruled in favor of the tenants, the Court of Appeals reversed. *Id.* at 146, 164. The Court first held that the tenants could not recover under the Consumer Protection Act because although that Act provided broad enforcement powers to the Attorney General's Office, private remedies under the Act were limited to recovering actual damages, which the tenants had not proven. *Id.* at 151-53, 157-58. The Court then held that the tenants also could not recover rent they alleged they had "paid pursuant to an illegal and unenforceable lease." *Id.* at 158. The Court reasoned that "even if the lease were unenforceable by the landlords, the tenants have received everything that they bargained for, and a necessary element justifying the remedy of restitution, *i.e.*, unjust enrichment, is lacking." *Id.* at 159.

In *Galola v. Snyder*, a companion case to *CitaraManis*, the Court held that the circuit court had erred in granting summary judgment in favor of a tenant against an unlicensed landlord based only on proof of voluntary payment of rent. 328 Md. 182, 185-86 (1992). In that case, however, there was evidence that the tenant was harmed because the property contained defects that would have been uncovered by an inspection. *Id.* at 184-85. The Court therefore remanded the case for further proceedings to determine the amount of actual damages the tenant had incurred as a result of defects that would have been discovered upon an inspection required for licensure. *Id.* at 186.

12

Almost two decades later, in *McDaniel v. Baranowski*, the Court held that an unlicensed owner of multi-unit rental housing may not initiate a summary ejectment proceeding for a tenant's failure to pay rent. 419 Md. 560, 562-63 (2011). There, the Anne Arundel County Code prohibited persons from "operat[ing] a multiple[-unit] dwelling . . . without a license issued by the [County] Department [of Inspections and Permits.]" *Id.* at 564 (omission and some alterations in original) (quoting Anne Arundel County Code (2005; 2009 Supp.), § 11-10-102). The specified purpose of the license requirement was "to insure the safety and habitability of the premises, namely that the dwelling is 'clean, sanitary, fit for human occupancy, and in compliance with this title and other applicable State and County law.'" *McDaniel*, 419 Md. at 564-65 (footnote omitted) (quoting Anne Arundel County Code § 15-4-103). Unknown to the tenant at the time she rented the apartment, the landlord had failed to renew the license for the property for several years. *McDaniel*, 419 Md. at 564-65. When the tenant failed to pay rent after the first month, the landlord initiated summary ejectment proceedings pursuant to § 8-401 of the Real Property Article. *Id.* at 567. The tenant, who had discovered that the property was unlicensed, claimed that the landlord was precluded from bringing that action while unlicensed. *Id.* at 568-69. The tenant also sought recovery of the rent she had paid as restitution under the Consumer Protection Act. *Id.* at 570-71.

The Court first held that, in light of the summary nature of the ejectment proceedings, "a landlord in those jurisdictions requiring licensure[] must affirmatively plead and demonstrate that [the landlord] is licensed at the time of the filing of the

complaint . . . in order to initiate the summary ejectment process." *Id.* at 587. The Court concluded that "a landlord [should] not be able to seek to dispossess a tenant, summarily, without having a license to operate the leased premises as required by local ordinance." *Id.* at 585. Turning to the tenant's damages claim, the Court, relying on its decision in *CitaraManis*, held that the tenant could not recover rent previously paid to the landlord based on the lack of licensure, in the absence of any evidence that the property was uninhabitable or "that [the tenant] sustained any actual damages, such as bills for medical treatment, loss of wages, or the cost of securing suitable substitute housing, for example." *Id.* at 587-88. Although the tenant in *McDaniel* had alleged some problems with the property, it was not alleged to be uninhabitable, and the tenant did not present any evidence of actual damages. *Id.* at 565, 587-88.

Recently, the Court of Appeals stated that it was "clear" that its holding in *McDaniel* would apply to Baltimore City's current scheme for licensing rental properties. *Pettiford v. Next Generation Tr. Serv.*, 467 Md. 624, 642 (2020). Thus, "to avail itself of the summary ejectment process now, a Baltimore City landlord must affirmatively plead and demonstrate in a complaint that the landlord possesses a license to operate the premises." *Id.*

The Aletis argue that the rule of *CitaraManis* and *McDaniel* does not apply here because, unlike the licensing schemes at issue in those cases, § 5-4(a)(2) expressly prohibits a landlord from "charg[ing], accept[ing], retain[ing], or seek[ing] to collect any rental payment or other compensation" unless properly licensed. We now turn to that contention.

14

## II. SECTION 5-4(A)(2) PRIVATE RIGHT OF ACTION CLAIM

The Aletis first contend that § 5-4(a)(2) affords them an implied private right of action to recover payments made to Metropolitan while it did not hold an active rental license for 10 Light Street. Metropolitan argues that the circuit court correctly determined that the ordinance does not provide a private right of action. We agree with Metropolitan and the circuit court.

As an initial matter, it is important to clarify our point of focus. Subsection 5-4(a) contains two numbered subparts. Subpart (1) prohibits any person from renting or offering to rent to another any rental dwelling in the absence of "a currently effective license to do so[.]" Subpart (2) then prohibits any such person from charging, accepting, collecting, or retaining rent from another unless the person was licensed at the relevant times. The Aletis seek here to enforce only subpart (2), as they acknowledge that Metropolitan had rectified the lack of licensure of 10 Light Street before they filed their complaint. Our concern is thus whether there is an implied private right of action for a tenant to enforce § 5-4(a)(2) by seeking a refund of rent paid during a period in which the landlord was unlicensed.

A private right of action allows an individual to bring an action in his or her personal capacity to enforce a legal claim. *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 517 (2014). Where, as here, a statute or ordinance "does not explicitly provide a cause of action" for claimants who "ha[ve] adequately alleged a violation," we must assess whether there is an implied right of action. *See Scull v. Groover, Christie & Merritt, P.C.*, 435 Md. 112, 121 (2013); *see also California v. Sierra Club*, 451 U.S. 287, 289-90 (1981)

15

(stating that where a statute "does not explicitly create a private enforcement mechanism" under which a plaintiff can bring a claim, a court must determine whether "a private right of action can be implied" for a plaintiff to bring "a claimed violation of [the statute]"). In determining whether an implied right of action exists, our "central inquiry" is whether the legislative body intended to provide a private right to bring suit. *Fangman v. Genuine Title, LLC*, 447 Md. 681, 694 (2016) (quoting *Baker v. Montgomery County*, 427 Md. 691, 710 (2012)). In doing so, we consider three relevant factors:

> First, is the plaintiff "one of the class for whose especial benefit the statute was enacted [.]" Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

*Baker*, 427 Md. at 709 (alteration in *Baker*) (quoting *Cort v. Ash*, 422 U.S. 66, 78 (1975), *overruled in part by Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979)).

As with any exercise of statutory interpretation, our "goal . . . is to discern and carry out the intent of the [legislative body]." *Aleman v. State*, 469 Md. 397, 421 (2020). We "first look[] to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Berry v. Queen*, 469 Md. 674, 687 (2020) (quoting *Brown v. State*, 454 Md. 546, 551 (2017)). In doing so, "[o]ur inquiry is not confined to the specific statutory provision at issue on appeal. Instead, '[t]he plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute.'" *Berry*, 469 Md. at 687

16

(alteration in original) (internal citation and quotation marks omitted) (quoting *Johnson v. State*, 467 Md. 362, 372 (2020)). That context may include the statute's "relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case." *Berry*, 469 Md. at 687 (quoting *Blackstone v. Sharma*, 461 Md. 87, 114 (2018)).

"Where the statutory language is subject to more than one reasonable interpretation, or its meaning is not clear when considered in conjunction with other statutory provisions, we may glean the legislative intent from external sources." *Johnson v. Md. Dep't of Health*, 470 Md. 648, 674 (2020) (quoting *In re R.S.*, 470 Md. 380, 403 (2020)). Such external sources may include:

> the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions.

*Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*, 456 Md. 272, 295 (2017) (quoting *Bellard v. State*, 452 Md. 467, 482 (2017)). "[W]e must give the statute in question a reasonable interpretation, 'not one that is absurd, illogical, or incompatible with common sense.'" *Johnson*, 470 Md. at 675 (quoting *Lockshin v. Semsker*, 412 Md. 257, 276 (2010)).

**A. Section 5-4(a)(2) Was Enacted for the Purpose of Enforcing Compliance with the Licensure Requirement of § 5-4(a)(1).**

The first *Baker* factor is whether the ordinance was enacted for the special benefit of a class of whom the Aletis are a part. We therefore consider whether § 5-4(a)(2) was enacted to provide a "beneficial right" to tenants. *Baker*, 427 Md. at 710. "If a statute's language provides a right to a particular class of persons, there is a strong inference that the legislature intended the statute to carry an implied cause of action. Conversely, that inference becomes attenuated when the statute is framed as a 'general prohibition or a command' to a governmental entity or other group or confers a generalized benefit." *Id.* at 710-11 (internal citations omitted) (quoting *Universities Rsch. Ass'n v. Coutu*, 450 U.S. 754, 772 (1981)). The question of whether an enactment benefits a special class "is not simply who would benefit from the [enactment], but whether [it was] intended to confer . . . rights upon those beneficiaries." *Sierra Club*, 451 U.S. at 294. The law at issue must therefore "unmistakably focus on a[] particular class of beneficiaries whose welfare [a legislature] intended to further," *id.*, and not be a generalized, "prohibitive command," *Baker*, 427 Md. at 711.

The Aletis contend that § 5-4(a)(2) operates for the specific benefit of tenants—a class of which they are a part—by prohibiting landlords from charging rent to tenants residing in unlicensed properties. That contention, however, misapprehends the role § 5-4(a)(2) plays in the statutory scheme. The apparent purpose of § 5-4(a)(2) is to benefit the City and the public generally, including tenants, by forcing landlords to comply with the licensing requirement in § 5-4(a)(1), not to benefit tenants with rent-free housing in

18

unlicensed properties. The benefits the City Council intended to confer through § 5-4(a) are those accompanying licensure.

The Aletis argue that by prohibiting a "person" from charging or collecting rent from "another" for an unlicensed property, the provision necessarily reflects an intent to benefit tenants because they are the "another" from whom rent and other fees may not be collected. But the fact that tenants might benefit from the prohibition on the collection of rent does not mean that the City Council desired or intended that outcome. Viewed in isolation, § 5-4(a)(2) begs the question of *why* landlords are prohibited from charging tenants rent while unlicensed. That question is answered by viewing § 5-4(a)(2) in the context of the remainder of the statutory scheme.

As described above, the overarching goals of Article 13, as set forth in § 2-1, include clearing and/or remediating deteriorated or deteriorating areas in Baltimore City and preventing the threatened deterioration of other areas. *See id.* § 2-1(a)(1), (2). Those objectives are intended to prevent numerous social and economic ills identified in the Code. *Id.* § 2-1(2). Thus, with respect to areas of the City that are "not yet deteriorated or deteriorating," the City Council has a goal of conserving those areas through "the enforcement of applicable regulatory codes relating to buildings, housing, sanitation or safety, [and] the rendering of services to community organizations[.]" *Id.* § 2-1(b)(1). Those provisions certainly benefit tenants, but the Code makes plain that the City Council's focus was broader. *Cf. Erie Ins. Co. v. Chops*, 322 Md. 79, 91 (1991) (in the course of rejecting a claimed private right of action, stating that, "[a]lthough the [plaintiffs] may

19

properly be said to be within the class of persons in whose favor the statute was intended, it seems equally apparent that the principal focus of the uninsured motorist laws is for the general protection of the public").

As part of its "comprehensive and integrated program" to further that intent, *id.* § 2-1(b)(2), the City Council enacted the licensing scheme that now resides in Subtitle 5 of Article 13, which requires periodic licensure of all rental properties within the City. Obtaining that licensure, in turn, requires satisfaction of several prerequisites, including the registration of all rental units, successful completion of an inspection by private or governmental inspectors, compliance with laws pertaining to lead paint, and an absence of unabated code violations. *Id.* §§ 5-4 – 5-7. Such "requirements are designed to insure the safety and habitability of the premises[.]" *McDaniel*, 419 Md. at 564-65 (footnote omitted).

Turning back to § 5-4, we conclude that the City Council's apparent intent was to require that all rental properties in the City be licensed and, in doing so, fulfill all the requirements for licensure, which in turn benefits tenants as well as the City and the public generally. In that scheme, the role of the prohibition in § 5-4(a)(2) against charging, accepting, retaining, or seeking to collect rent during a period of non-licensure is to promote licensure. We see nothing in the statutory scheme broadly or in § 5-4(a)(2) specifically that suggests an intent to specially benefit tenants by providing them with free, unlicensed housing. To the contrary, the apparent legislative intent was for there to be no unlicensed housing, and § 5-4(a)(2) is a coercive mechanism to effectuate that intent.

**B.** **Indicia of Legislative Intent Suggest an Intent to Enforce § 5-4(a)(2) Through Executive Action, Not a Private Right of Action.**

The second factor we consider is whether there are any indications of legislative intent to either create or deny a private remedy under § 5-4(a)(2). *See Baker*, 427 Md. at 709. The Aletis assert that the "plain and unambiguous language" of the provision evinces such an intent, reasoning that because the language prohibits an unlicensed landlord from collecting or retaining rent, § 5-4(a)(2) "clearly impl[ies]" a "tenant-specific remedy" in which a landlord must return improperly collected rent. Metropolitan contends that neither the plain language nor the ordinance's history indicates any express or implied legislative intent to create a private cause of action. We agree with Metropolitan.

The plain language of § 5-4(a)(2) is a broad and sweeping prohibition against landlords not only charging, accepting, or seeking to collect rental payments, but also retaining such payments. It is thus plain that the City Council intended to create a strong financial disincentive for landlords to ignore the licensing requirement. Nonetheless, the question before us is neither whether Metropolitan violated the ordinance in the past nor whether it is currently in violation of the ordinance by retaining payments previously received. The question here is whether the City Council intended to provide tenants with a private cause of action to enforce such violations. To that extent, it is notable that the

21

language employed by the City Council imposes a restriction on landlords; it does not purport to create a right or entitlement for tenants.[6]

Moreover, Subtitle 5 establishes several enforcement mechanisms, all of which require executive action. Section 5-15 outlines the City Housing Commissioner's authority to deny, suspend, or revoke a license. Section 5-17 authorizes the Housing Commissioner to order an unlicensed rental dwelling to be vacated if "necessary for the public health, safety, and welfare." Section 5-25 permits enforcement of any requirements in Subtitle 5, including the licensing requirements, by issuance of an environmental citation.[7] And § 5-26 provides that any violation of the subtitle constitutes a misdemeanor criminal offense punishable by penalties of up to $1,000 per day. The existence of these public enforcement provisions, with no analogous private enforcement remedy, suggests that the City Council did not intend to authorize a private remedy. *See, e.g.*, *Chops*, 322 Md. at 91 (concluding that the presence of alternative legislative remedies weighed against a finding

---

[6] By contrast, other provisions of the City Code use language that does create specific rights or entitlements for tenants, *see, e.g.*, Balt. City Code, Art. 13 § 6-6 ("If, after [an] offer of sale . . . there is a change in tenants, the new tenant shall be entitled to notification and the right to enter into a contract with the landlord[.]"), or to refunds of amounts previously paid, *see, e.g.*, *id.* Art. 15 § 12-7 ("If the City acquires title to . . . a commercial parking facility or terminates an existing lease . . . then the owner, lessee, or operator is entitled to a refund of that portion of the license fee paid for the unexpired term of the license.").

[7] The Aletis argue that § 5-25 implies the existence of a private right of action by stating that the ability to enforce the provisions of Subtitle 5 by issuance of an environmental citation is "[i]n addition to any other civil or criminal remedy or enforcement procedure[.]" *Id.* § 5-25(a). However, although that anti-exclusivity provision evidences an intent not to preempt any otherwise-extant remedies, it cannot reasonably be read to create a new private right of action.

22

of an implied private cause of action). In *Chops*, the Court of Appeals held that although providing the plaintiffs with a private right of action would not have been "inconsistent with the underlying purpose of the legislative scheme," the existence of alternative legislative remedies meant that such a right was not "necessary to properly implement the legislation." *Id.*; *see also Sugarloaf Citizens Ass'n v. Gudis*, 78 Md. App. 550, 559-60 (1989) (internal citations omitted) (stating that a county ethics law, which contained "criminal penalties [and] administrative punishment, and allow[ed] the county attorney to petition for injunctive relief," did not confer a private right of action to citizens), *aff'd*, 319 Md. 558 (1990).

We also find no support for an implied private right of action in the legislative history. Section 5-4(a)(2) was added to Subtitle 5 as part of a set of amendments adopted in 2018. The statement of purpose the City Council adopted at the time does not expressly reference the addition of § 5-4(a)(2), much less identify an intent to provide a private mechanism to enforce it.[8] The legislative bill file similarly contains no reference to the

---

[8] The statement of purpose is:

FOR the purpose of adding certain non-owner-occupied 1- and 2-family dwellings to the licensing, inspection, and related requirements for multi-family dwellings and rooming houses (collectively, "rental dwellings"); modifying the fees, procedures, and prerequisites for the registration of certain non-owner-occupied dwellings, rooming houses, and vacant structures; modifying the procedures and prerequisites for the licensing of rental dwellings; providing for the denial, suspension, or revocation of a rental dwelling license under certain circumstances; providing for judicial and appellate review of administrative decisions relating to the registration or the licensing of these structures; amending the underlying definition of "rooming house" to clarify its applicability to a bed and breakfast facility;

23

intent or purpose behind § 5-4(a)(2). Indeed, the sole mention of the provision in the bill file, which is contained in a letter from an organization that was supportive of the bill, is purely descriptive: "An owner must have a currently effective license in order to rent and collect rent." The "silence within the legislative history as to a private cause of action reinforces the decision not to find such a right implicitly." *Fangman*, 447 Md. at 713 (quoting *Baker*, 427 Md. at 714); *see also Baker*, 427 Md. at 715 ("[L]egislative bodies know how to 'salt the mine' for the enablement of implied private causes of action."). We therefore conclude that the second factor, like the first, weighs against finding an implied private right of action to recover rent paid while a property was unlicensed.

C. **Implying a Private Right of Action Would Not Necessarily Be Consistent with the Legislative Purpose of § 5-4(a)(2).**

The third factor we consider is whether a private right of action to enforce § 5-4(a)(2) would be "consistent with the underlying purposes of the legislative scheme[.]" *Baker*, 427 Md. at 709 (quoting *Cort*, 422 U.S. at 78). Because reasonable arguments can be made on both sides, we view this factor as neutral. On the one hand, taking a narrow view of the City Council's purpose in enacting § 5-4(a)(2), it might be reasonable to view

---

defining and redefining certain other terms; imposing certain penalties; correcting, clarifying, and conforming related language; providing certain transition rules for pre-existing licenses; providing for a special effective date; and generally relating to the registration of non-owner-occupied dwellings, rooming houses, and vacant structures and to the licensing of rental dwellings.

Baltimore City Ordinance 18-130 (Aug 1, 2018), *available at* https://dhcd.baltimorecity.gov/sites/default/files/Full_text_of_Council_Bill_18-0185.pdf (last accessed June 4, 2021).

a private right of action as consistent with the underlying purpose of promoting licensure. After all, if the City Council viewed the prospect of being unable to collect or retain rent while unlicensed as a hammer to compel compliance with the licensing requirement, it could reasonably be argued that the prospect of facing tenant claims for reimbursement would be even more effective in compelling compliance.

On the other hand, it is also possible that the City Council might conclude that the existence of such a private right of action might undermine the overarching goals reflected in § 2-1 of Article 13 if, for example, claims for repayment of rent were to imperil the continued financial viability of a landlord who was, for a significant period of time, unknowingly out of compliance with the licensing requirement but compliant with all of the prerequisites for licensure.[9] That possibility might be especially acute for small landlords renting one- and two-unit dwellings, to whom the City Council extended the licensing requirement at the same time it enacted § 5-4(a)(2). Perhaps for those reasons, the remedies for violations that are expressly created in the ordinance are left to the discretion of executive authorities.

Ultimately, whether the creation of an implied right of action to enforce § 5-4(a)(2) would be consistent with the legislative purpose is a policy judgment that is not for us to

_____

[9] Metropolitan suggests such an innocent explanation for its own lack of compliance with the recently enhanced licensing scheme. Because we limit our consideration of the merits of the circuit court's ruling on Metropolitan's motion to dismiss to the facts stated in the complaint, which does not identify the reason for the lack of licensure, we do not consider Metropolitan's explanation here. Nonetheless, it is appropriate to consider the possible repercussions of interpreting the ordinance to establish a private right of action in our analysis of whether doing so is consistent with the legislative purpose.

25

make.[10] *See Fangman*, 447 Md. at 723-24 (stating that policy considerations related to the creation of private rights of action are best left to legislative bodies). For reasons we have already discussed, we see no indication in the statutory scheme or legislative history of § 5-4(a)(2) that the City Council intended to create such a right. We therefore conclude that there is no private cause of action to enforce § 5-4(a)(2). Accordingly, we will affirm the circuit court's dismissal of Count II.

### III.    BREACH OF CONTRACT

The Aletis contend that the circuit court erred in dismissing Count IV of the complaint, in which they alleged that Metropolitan breached the Lease by charging them rent while it was unlicensed. Their claim is premised on ¶ 44 of the Lease, which provides:

> It is the intent of the parties to comply with the laws of Maryland, including local county and municipal ordinances. . . . In the event no other addendum

---

[10] As an alternative ground for affirming the dismissal of Count II, Metropolitan argues that the "City Council does not have the constitutional authority . . . to create private causes of action." (Quoting *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 452 (D. Md. 2014)). In reaching that conclusion in *Bourgeois*, the federal district court relied on *McCroy Corp. v. Fowler*, 319 Md. 12 (1990), *superseded by statute as stated in Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606 (2010). In *McCroy*, the Court of Appeals invalidated a Montgomery County ordinance that had created a private cause of action for victims of employment discrimination. 319 Md. at 20. In doing so, the Court found that it typically is the General Assembly's role to create new causes of action for issues "of statewide concern," like the ordinance at issue. *Id.* at 24. However, the Court distinguished such ordinances from those that address "subject matters of a peculiarly local nature"—citing snow removal and towing laws as examples—which help a municipality carry out "its own legal duties." *Id.* For such local laws, "a municipality can create a right of action[.]" *Id.* (quoting *Bittle v. Brunetti*, 750 P.2d 49, 59 (Colo. 1988)); *cf. Gunpowder Horse Stables, Inc. v. State Farm Auto. Ins.*, 108 Md. App. 612, 633 (1996) ("[A] county may not create a new cause of action between private parties concerning matters of *statewide concern*." (emphasis added)). Regardless, because we conclude that the City Council did not create an implied private cause of action to enforce § 5-4(a)(2), we need not reach the question of whether it could have done so.

26

is attached to this Apartment Lease Contract and the local laws or ordinances provide additional rights or remedies not included herein, this Apartment Lease Contract is amended by reference to such local laws and ordinances to incorporate the terms, rights, or remedies thereof herein. It is the intent of the parties to have this lease construed to include any such rights or remedies herein, and the provisions of such laws or ordinances shall supercede [sic] and control over the language of this Apartment Lease Contract to the extent they are in conflict. . . .

For two reasons, we conclude that the circuit court correctly dismissed Count IV. First, ¶ 44 purports to incorporate "by reference . . . the terms, rights, or remedies" of applicable local laws and ordinances. As we have already concluded that § 5-4(a)(2) does not provide a private right or remedy to tenants, no such right or remedy can be incorporated by reference into the Lease through ¶ 44.

Second, the Aletis have not identified any material breach of the Lease or any cognizable damages from any such breach. The Aletis' complaint alleges that they incurred damages "because they paid [Metropolitan] rent and other compensation in exchange for occupancy of the Rental Property and Legal Fees during the 302 days when the Rental was not properly registered and licensed as required by the Baltimore City Code." But, as already discussed, the intent of § 5-4(a)(2) is to force compliance with the obligation to become licensed, not to provide rent relief to tenants in unlicensed housing. The Aletis do not allege the existence of any deficiencies in the apartment they rented that would have become apparent, and so would have been remedied, if Metropolitan had been properly licensed, and aside from their claims related to § 5-4(a)(2), the complaint does not allege that Metropolitan failed to provide the Aletis with the full benefit of the bargain reflected in the Lease. They have thus not pled facts that would establish a material breach

27

of the Lease or resulting damages. *See Barufaldi v. Ocean City, Chamber of Com.* 196 Md. App. 1, 23 (2010) ("A breach is material when it 'is such that further performance of the contract would be different in substance from that which was contracted for.'" (some internal quotation marks omitted) (quoting *Dialist Co. v. Pulford*, 42 Md. App. 173, 178 (1979))). This result is consistent with those cases in which the Court of Appeals concluded that tenants could not recover rent voluntarily paid to unlicensed landlords due solely to the lack of a license. *See, e.g.*, *Galola v. Snyder*, 328 Md. 182, 185-86 (1992) (holding that a tenant is required to prove actual loss or injury arising from the lack of licensure); *McDaniel v. Baranowski*, 419 Md. 560, 587-88 (2011) (same); *CitaraManis v. Hallowell*, 328 Md. 142, 157-58 (1992) (same).

Accordingly, we will affirm the circuit court's dismissal of Count IV.

## IV.    MONEY HAD AND RECEIVED

The Aletis next contend that the court erred in dismissing their claim for money had and received, a cause of action that they assert "applies to any fact pattern[.]" (Emphasis removed). The Aletis posit that "whether or not the lease has been fully performed," they were "deprived the protections" of § 5-4(a) and are entitled to a refund of payments made while 10 Light Street was unlicensed. According to their complaint, these payments fall into two categories: (1) rent payments and related fees, such as utility fees, trash fees, and late fees; and (2) legal fees that Metropolitan charged them in pursuing court actions for failure to pay rent. Metropolitan counters that a cause of action for money had and received "does not lie on an executed contract" and would unjustly enrich the Aletis.

28

We hold that the court did not err in dismissing the claim for money had and received for the Aletis' payments for rent or related fees that they paid during the unlicensed period. However, we conclude that the court erred in dismissing the Aletis' claim as to any legal fees Metropolitan may have collected during the unlicensed period in connection with bringing actions for nonpayment of rent. We therefore will vacate that part of the court's judgment and remand for further proceedings.

## A.    Actions for Money Had and Received Generally

An action for money had and received is one of the "'common counts' . . . that developed under English common law as a branch of the common law writ of assumpsit[.]" *Bourgeois v. Live Nation Ent., Inc.*, 430 Md. 14, 45 (2013). The common counts were "developed as standard and handy descriptions of a number of set fact patterns for quasi-contractual restitution in General Assumpsit." *Alternatives Unlimited, Inc. v. New Baltimore City Bd. of Sch. Comm'rs*, 155 Md. App. 415, 476 (2004). The counts are thus "particular kinds of quasi-contract" that "refer to fact patterns which may call for restitution to prevent unjust enrichment."[11]  *Id.* (emphasis removed) (quoting 1 Dan B. Dobbs, *Law of Remedies* 581 (2d ed. 1993)). Money had and received is a claim for restitution in circumstances in which "the defendant has obtained possession of money which, in equity

---

[11] The "more familiar" common counts include "1) money paid to the defendant's use, 2) money had and received, 3) use and occupation of land, 4) goods sold and delivered, 5) quantum valebant ('how much were they [the goods] worth?'), and 6) quantum meruit." *Alternatives Unlimited*, 155 Md. App. at 476-77 (alteration in original) (citing Dobbs at 581-83).

and good conscience, [the defendant] ought not to be allowed to retain." *Bourgeois*, 430 Md. at 46 (quoting *Benson v. State*, 389 Md. 615, 652-53 (2005)).

Although money had and received is an action at law, our courts have long held that it is governed by equitable considerations. *See, e.g.*, *State to Use of Emp. Sec. Bd. v. Rucker*, 211 Md. 153, 157-58 (1956) ("[T]he gist of [the money had and received] action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money.") (citation omitted); *Callahan v. Linthicum*, 43 Md. 97, 105 (1875) ("[M]oney had and received, is an equitable action . . . and the plaintiff, in support of it, can resort to all equitable circumstances incident to his case."). Because of its origins in quasi-contract, a claim for money had and received generally "allow[s] the recovery of money paid under a contract still executory in nature," and is "generally not to recover money paid under a fully executed contract." *Bourgeois*, 430 Md. at 49.

The Court of Appeals discussed the common law action for money had and received at length in *Bourgeois*. There, ticket purchasers sued several ticket agencies in the United States District Court for the District of Maryland and alleged that the agencies were in violation of a Baltimore City ordinance by collecting excessive service charges for tickets for events in the City. *Id.* at 17-18. Among the counts the plaintiffs pled was a count for money had and received, pursuant to which the plaintiffs sought restitution of the amounts collected by the ticket agencies over and above what was permitted by the ordinance. *Id.* at 18-19.

In answering certified questions from the federal court, the Court first confirmed that Maryland continues to recognize an action for money had and received. *Id.* at 46. The Court then concluded that such an action could lie to recover money for the service charges that were barred by the City ordinance. The Court observed that Maryland courts have found the action to be available to recover money paid under mistake of fact, mistake of mixed law and fact, or as "money obtained by fraud or false pretenses, paid upon an unexecuted illegal contract, or, in certain circumstances, paid under an executed illegal contract." *Id.* at 48. The "branch of the action" most applicable to the plaintiffs' claim was recovery of amounts "paid pursuant to an illegal, and thus allegedly void, agreement." *Id.* The Court observed that recovery in such a case was ordinarily limited "to recover money paid under an *executory* illegal contract—one not yet fully consummated—but generally not to recover money paid under a fully executed contract." *Id.* at 49. The basis for the distinction is that the courts will treat an illegal executory contract as a nullity and order restitution independent of the contract. *Id.* "When the contract is fully executed, however, the situation is different, for in that setting, the parties *ordinarily* are *in pari delicto* and neither should be able to take advantage of the illegality." *Id.* In the case of a fully executed contract, provided "there are no special circumstances that would preclude a finding that the parties were *in pari delicto*, [an] action [for money had and received] will not lie." *Id.* at 51. When the case returned to the federal district court, the court found that the plaintiffs could pursue their claim for money had and received because they were not

31

*in pari delicto* with the ticket agencies. *Bourgeois v. Live Nation Ent.*, 3 F. Supp. 3d 423, 452 (D. Md. 2014).

## B. The Court Did Not Err in Dismissing the Aletis' Claim for Money Had and Received as to Payments for Rent and Related Fees.

Relying on *Bourgeois*, the Aletis contend that they have properly pled a claim for money had and received because they are members of the class § 5-4(a)(2) was intended to benefit, Metropolitan violated the ordinance, and the parties are not *in pari delicto*. Metropolitan responds that unlike the plaintiffs in *Bourgeois*, the Aletis are *in pari delicto* because the lease was fully executed, and, accordingly, they cannot avail themselves of the cause of action for money had and received.

With respect to the Aletis' claim for restitution of rent and related fees they paid pursuant to the Lease, the circuit court correctly determined that the complaint does not state a claim on which relief can be made. An action lies for money had and received "whenever the defendant has obtained possession of money which, in equity and good conscience, [the defendant] ought not to be allowed to retain." *Bourgeois*, 430 Md. at 46 (quoting *Benson*, 389 Md. at 652-53). In *CitaraManis*, the Court of Appeals determined that a tenant could not recover rent paid to an unlicensed landlord, absent evidence of actual damages, because "the tenants have received everything that they bargained for, and a necessary element justifying the remedy of restitution, *i.e.*, unjust enrichment, is lacking." 328 Md. at 158-59; *see also McDaniel*, 419 Md. at 587. In other words, where a landlord has provided all that was bargained for, there is no injustice in permitting the landlord to keep rent and other fees paid under the lease based solely on the landlord's lack of

32

licensure.  *See Galola*, 328 Md. at 186 (stating that "voluntary payment of rent under an unenforceable lease does not entitle a tenant to restitution of that rent unless the tenant . . . was provided less than [the tenant] had bargained for in the lease").  "[E]quity and good conscience" do not require restitution of those amounts.  *Bourgeois*, 430 Md. at 46 (quoting *Benson*, 389 Md. at 652).

*Bourgeois*, on which the Aletis primarily rely, is inapposite.  There, the ordinance at issue made it unlawful for ticket agencies to charge certain fees over and above the face value of the tickets being sold.  430 Md. at 17.  The very purpose of the ordinance was thus to protect purchasers of such tickets—including the plaintiffs in that action—from having to pay those charges.  *Id.*  Here, by contrast, the problem was Metropolitan's lack of licensure, not the rent or associated fees it charged.  For the reasons expressed by the Court of Appeals in *CitaraManis*, *McDaniel*, and *Galola*, there is no injustice in denying restitution of otherwise lawful rent and related fees based solely on Metropolitan's lack of licensure.

C.    **The Court Erred in Dismissing the Aletis' Claim for Legal Fees Incurred in Connection with Metropolitan's Failure to Pay Rent Actions.**

We reach a different conclusion with respect to the Aletis' claim for restitution of legal fees charged by Metropolitan for bringing actions for nonpayment of rent during the period in which it was unlicensed.  Under § 8-401 of the Real Property Article (2015 Repl.; 2020 Supp.), if a tenant fails to pay rent "when due and payable," a landlord may initiate a complaint for failure to pay rent and for repossession of the rental property in the District

33

Court. Consistent with the Court of Appeals' holding in *McDaniel*, however, the landlord must "possess a current license to operate the premises . . . if the dwelling is located in a jurisdiction that requires owners to obtain such licenses," 419 Md. at 563, and the landlord "must affirmatively plead and demonstrate that [the landlord] is licensed at the time of the filing of the complaint," *id.* at 587.

It is undisputed that Metropolitan was required to possess a rental license to operate 10 Light Street. The Aletis have alleged that: (1) Metropolitan was unlicensed for a period of 302 days; (2) during that period, notwithstanding its lack of licensure, Metropolitan filed actions against the Aletis for failure to pay rent in violation of local and State law; (3) Metropolitan charged the Aletis legal fees for bringing actions it had no right to bring and which were based on false representations concerning its licensure status; and (4) Metropolitan collected and continues to retain those legal fees. If true, those allegations could form the basis of an action for money had and received. *See Bourgeois*, 430 Md. at 48 (stating that Maryland cases have recognized grounds for an action for money had and received including mistake of fact or law and money obtained by fraud or false pretenses). We therefore hold that the circuit court erred in dismissing Count III to the extent that the Aletis seek restitution of amounts Metropolitan charged them in legal fees for bringing actions against them for failure to pay rent during a period in which it was unlicensed.

## V. DECLARATORY JUDGMENT

We now turn to Count I, in which the Aletis requested that the court issue a declaratory judgment concerning the rights and obligations of the parties. The court

34

declined to do so, stating in its oral ruling that "having dismissed the substantive counts, there remains no issue of justiciable controversy for which a declaratory judgment would be warranted." For two independent reasons, we hold that the circuit court erred in entering judgment on Count I without declaring the rights and obligations of the parties. First, even if the court were correct that its rulings on Counts II through IV settled the entire dispute between the parties, it still was required to enter a declaratory judgment. Second, the court's rulings on Counts II through IV did not settle the dispute the Aletis identified in Count I. We will therefore vacate the judgment entered on Count I and remand to the circuit court for entry of a proper declaration.

## A.      The Court Was Required to Enter a Declaratory Judgment.

"[A] declaratory judgment does not seek to 'enforce a claim against [a] defendant,' but rather seeks a 'judicial declaration as to the existence and nature of a relationship between [the plaintiff] and the defendant.'" *Daughtry v. Nadel*, 248 Md. App. 594, 630 n.26 (2020) (some alterations in original) (quoting *Bankers & Shippers Ins. Co. of New York v. Electro Enters., Inc.*, 287 Md. 641, 653 (1980) (in turn quoting Restatement of the Law (Second), Judgments § 76, Comment c.)). The Court of Appeals has explained the requirements for the entry of a declaratory judgment:

> [W]hen a declaratory judgment action is brought and the controversy is appropriate for resolution by declaratory judgment, the court must enter a declaratory judgment and that judgment, defining the rights and obligations of the parties or the status of the thing in controversy, must be in writing. It is not permissible for the court to issue an oral declaration. . . . When entering a declaratory judgment, the court must, in a separate document, state in writing its declaration of the rights of the parties, along with any other order that is intended to be part of the judgment. Although the judgment may recite

35

that it is based on the reasons set forth in an accompanying memorandum, the terms of the declaratory judgment itself must be set forth separately. Incorporating by reference an earlier oral ruling is not sufficient, as no one would be able to discern the actual declaration of rights from the document posing as the judgment. This is not just a matter of complying with a hyper-technical rule. The requirement that the court enter its declaration in writing is for the purpose of giving the parties and the public fair notice of what the court has determined.

*Bowen v. City of Annapolis*, 402 Md. 587, 608-09 (2007) (alteration in original and emphasis removed) (quoting *Allstate Ins. v. State Farm Mut. Auto. Ins*., 363 Md. 106, 117 n.1 (2001)).

"[T]he existence of a justiciable controversy is an absolute prerequisite to the maintenance of a declaratory judgment action." *Floyd v. Mayor & City Council of Baltimore*, 179 Md. App. 394, 429 n.22 (2008) (quoting *Boyds Civic Ass'n v. Montgomery County Council*, 309 Md. 683, 689 (1987)), *aff'd*, 407 Md. 461 (2009). A justiciable controversy "is one in which 'there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded.'" *Id.* (emphasis removed). However, our courts have repeatedly held that "a party may seek a declaratory judgment 'notwithstanding a concurrent common-law, equitable, or extraordinary legal remedy[.]" *Hanover Invs. v. Volkman*, 455 Md. 1, 16 (2017) (quoting Cts. & Jud. Proc. § 3-409(c)); *see Allied Inv. Corp. v. Jasen* , 354 Md. 547, 556-57 (1999) ("That a separate claim exists upon which suit could be brought . . . ordinarily does not defeat a party's right to seek and obtain a declaratory judgment[.]"). And, notably, our courts "have not . . . generally blessed the dismissal of a proper action for declaratory

36

judgment because of a ruling on an alternative claim in the same action." *Post v. Bregman*, 349 Md. 142, 160 (1998).

In sum, a ruling on substantive counts brought as part of a lawsuit in which a plaintiff also seeks a declaratory judgment does not render the declaratory judgment claim moot or non-justiciable. For that reason, even if the court were correct that its rulings on Counts II through IV effectively resolved the dispute identified by the Aletis in Count I, the court still was required to enter a judgment declaring the rights and obligations of the parties.

**B.** **The Rulings on Counts II through IV Did Not Resolve the Dispute Identified in Count I.**

More importantly, the court's resolution of Counts II through IV did not resolve the dispute identified in Count I. As we have discussed, in Counts II through IV, the Aletis sought to recover damages for Metropolitan's failure to comply with § 5-4(a)(2). The dispute as to which the Aletis sought a declaratory judgment in Count I, however, did not involve recovery of amounts they had already paid, but amounts they claimed Metropolitan was still attempting to collect from them and others. They alleged that Metropolitan had filed failure to pay rent complaints to recover rent attributable to the period in which it was not licensed and that it had taken the position that its prior lack of licensure did not restrict it "from pursuing [failure to pay rent] Complaints or collecting the corresponding Legal Fees or unpaid rent and other compensation in a breach of contract action." The Aletis thus sought a declaratory judgment to resolve the dispute.

The circuit court's resolution of Counts II through IV, all of which related to recovery of amounts the tenants had already paid, therefore did not resolve the dispute the Aletis identified in Count I, which related to collection of amounts the tenants had not paid. For that reason as well, we will vacate the judgment entered with respect to Count I and remand for further proceedings.

## CONCLUSION

We conclude that:

- Section 5-4(a)(2) of Article 13 of the Baltimore City Code does not provide a private right of action to recover rent and related payments that a tenant made during a period in which a landlord was unlicensed. As a result, the court properly dismissed Count II of the complaint.

- The Aletis did not state a claim for breach of contract to recover payments that they made to Metropolitan under the Lease. As a result, the court properly dismissed Count IV of the complaint.

- To the extent they sought restitution of rent and related fees paid under the Lease during the period in which Metropolitan was unlicensed, the Aletis did not state a claim for money had and received. To that extent, we will affirm in part the court's dismissal of Count III of the complaint.

- However, the circuit court erred in dismissing the claim for money had and received to the extent that the Aletis sought restitution of legal fees they had paid related to actions Metropolitan had no legal right to bring. To that extent, we will reverse in part the court's dismissal of Count III of the complaint.

- The circuit court erred in dismissing Count I of the complaint without entering a declaratory judgment declaring the rights and obligations of the parties.

38

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 75% BY APPELLANTS AND 25% BY APPELLEES.**

39